Susan **ODGERS**, Plaintiff,

v.

**ORTHO PHARMACEUTICAL
CORP.,** Defendant.

**Civ. No. 78–70543.**

United States District Court,
E.D. Michigan, S.D.

May 29, 1985.

---

Harry Philo and Linda Miller Atkinson of Philo, Atkinson, Steinberg, White, Vigilotti & Keenan, Detroit, Mich., for plaintiff.

Wallson G. Knack and Paul T. Sorenson of Warner, Norcross & Judd, Grand Rapids, Mich., for defendant.

## OPINION AND ORDER

COHN, District Judge.

### I.

This is a products liability case. Plaintiff Susan Odgers (Odgers) alleges that her use of Ortho-Novum, an oral contraceptive manufactured by defendant Ortho Pharmaceutical Corp. (Ortho), caused a blood clot resulting in her partial paralysis. Odgers claims that Ortho's failure to adequately warn her directly and failure to adequately warn her physician, Dr. Joan Wake (Dr. Wake), of the possibility of blood clotting makes it liable to her for the damages she has suffered.

The case was initially tried in June 1980 on an instruction that Ortho owed Odgers a duty to directly warn her of the risks and potential side effects of Ortho-Novum. The jury found for Odgers.[1] Thereafter I granted Ortho a new trial on the grounds that my instruction was erroneous under Michigan law.[2]

On Odgers' motion, I subsequently certified the following question to the Michigan Supreme Court under Michigan General Court Rules of 1963, 797.2:

"Does the manufacturer of an oral contraceptive which is a prescription drug, in addition to its duty under the common law of Michigan to warn physicians of any risks inherent in the use of the oral contraceptive which it knows or should know to exist, *Smith v. E.R. Squibb & Sons*, 405 Mich. 79, 273 N.W.2d 476 (1979), have a duty under the common law of Michigan to provide adequate warnings directly to persons using the

---

[1] The jury also found, in response to a special interrogatory, that Odgers did not prove by a preponderance of the evidence that Dr. Wake had not been adequately warned of the risk of blood clotting associated with the use of Ortho-Novum. Though I eventually came to the conclusion that Ortho's duty was only to adequately warn Dr. Wake, Ortho's motion for judgment in accordance with special interrogatories was denied on the grounds that a finding by the jury that failure to prove that Dr. Wake had not been adequately warned was not the same as a finding that Dr. Wake had been adequately warned.

[2] See transcript of proceedings of October 30, 1980 at 10.

oral contraceptives where (1) relevant federal regulations require that the manufacturer provide adequate warnings directly to such persons on the label of the package and certain other warnings in a brochure made available to physicians for discretionary distribution to persons prescribed oral contraceptives and (2) issuance of the prescription is based on informed choice rather than solely physician decision?"

The Michigan Supreme Court, some 18 months after accepting the certified question for review, responded first, that there is no rule of law in Michigan that answers the question and second, declined to state a rule of law which would answer the question. A minority of three justices agreed with the majority of four justices that there was no rule of law on the question but dissented, taking the position that the question should be answered. The dissent then went on to impose a duty on the manufacturer of oral contraceptives to warn a user directly of known hazards associated with the use of the drug. See *In re Certified Questions*, 419 Mich. 686, 358 N.W.2d 873 (1984), *reh'g denied*, 421 Mich. 1202 (1985).

Now before me is Ortho's motion for summary judgment. Ortho urges that, in the absence of any Michigan rule of law on the question, I should adopt the rule that the manufacturer's duty to warn runs only to the prescribing physician, not to the patient. Ortho also argues that, should I find that Ortho's duty was only to warn Dr. Wake, there was no cause in fact between Ortho's alleged failure to warn and Odgers' injury in light of affidavits and deposition testimony by Dr. Wake to the effect that had she been warned of all of the risks involved in the use of Ortho-Novum, she would have prescribed it to Odgers regardless. For the reasons which follow I disagree with Ortho on the scope of its duty to warn.

## II.

The failure of the Michigan Supreme Court to state a rule of law on the question of a manufacturer's duty to warn a user of oral contraceptives does not relieve me of my duty to answer the question. "[A] federal court cannot decline jurisdiction of a case simply because it is difficult to ascertain what the state courts thereafter may determine the state law to be." 19 Wright, Miller & Cooper, *Federal Practice & Procedure*, § 4507 at 99; *Meredith v. City of Winter Haven*, 320 U.S. 228, 234–35, 64 S.Ct. 7, 10–11, 88 L.Ed. 9 (1943). "In the absence of a state court ruling our duty is tolerably clear. It is to decide, not avoid, the question." *Dailey v. Parker*, 152 F.2d 174, 177 (7th Cir.1945). See also *Ann Arbor Trust Co. v. North American Co. for Life and Health Insurance*, 527 F.2d 526, 527 (6th Cir.1975), *cert. denied*, 452 U.S. 993, 96 S.Ct. 2206, 48 L.Ed.2d 818 (1976) (quoting *Krakoff v. United States*, 431 F.2d 847, 848 (6th Cir.1970)) ("In spite of the uncertainty of [Michigan] law on this subject, this is not an appropriate case for abstention by this court.... 'Abstention is not ordinarily granted in cases involving only common law questions which a federal court, under its diversity jurisdiction, is bound to decide.' ").

In deciding an unsettled issue, it is my obligation to make an educated guess as to what decision would be reached by the Michigan Supreme Court,[3] "with respect to the policies involved in this litigation under the facts of the present case." *Ann Arbor Trust Co. v. North American Co. for Life and Health Insurance, supra*, at 527; *Travelers Insurance Co. v. Young*, 580 F.Supp. 421, 423 (E.D.Mich.1984); *Dunbar v. United Insurance Company of America*, 557 F.Supp. 228, 230 (E.D.Mich.1983). This entails consideration of analogous cases from this and other jurisdictions "scrutinized with an eye toward the broad policies that informed those adjudications, and to the doctrinal trends which they evince." *McKenna v. Ortho Pharmaceu-*

---

**3.** As to the argument of the majority in *In re Certified Questions* that this is an issue more appropriately dealt with by the legislature, see *infra* section III.

*tical Corp.,* 622 F.2d 657, 662 (3rd Cir.), *cert. denied,* 449 U.S. 976, 101 S.Ct. 387, 66 L.Ed.2d 237 (1980); *Overstreet v. Norden Laboratories, Inc.,* 669 F.2d 1286, 1289–90 (6th Cir.1982); *Korzetz v. Amsted Industries, Inc.,* 472 F.Supp. 136, 140 (E.D.Mich. 1979).[4] I may also consider scholarly treatises, the restatements of the law, and pertinent law review articles. *McKenna v. Ortho Pharmaceutical Corp., supra,* at 662–63.[5] In addition, "[f]aced with an unprecedented question of state law, [I] may also be guided by the law which in [my] opinion provides the most just and reasoned analysis." *Harrison v. McDonough Power Equipment, Inc.,* 381 F.Supp. 926, 930 (S.D.Fla.1974). While I must keep in mind that my function is to choose the rule that I believe the state's highest court, given "all that is known about its methods of reaching decisions," is likely to adopt sometime in the future, and not to choose the rule I would adopt were I free to decide for myself, at the same time diversity litigants should not be penalized for the choice of federal court by being deprived of the flexibility that a state court could reasonably be expected to show. Wright Miller & Cooper, *supra,* § 4507 at 103.[6]

### III.

Unlike the usual case in which I must make an "Erie guess", *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), as to how the state's highest court would decide an issue, in *In re Certified Questions* the Michigan Supreme Court was squarely presented with the question to be decided. Besides holding that there was no rule of law on the subject in Michigan the majority also stated that:

> "[t]he allocation of the duty to warn patients is a public policy question involving the marketing system and economics of a major industry and the everyday practice of an essential profession. We believe that the Legislature is in a better position to allocate those duties."

*In re Certified Questions,* at 868–869. I conclude, however, that the Michigan Supreme Court's deference to the legislature is, in the area of tort duties, clearly excessive, and that portion of the majority opinion which indicates that this issue might best be left to the legislature may be discounted and is not an obstacle to my answering the question.

█ The development of tort law has been characterized by the establishment of broad governing principles providing justice in individual cases.[7] Even the most radical changes in tort law have not generally been accomplished by legislative ac-

---

**4.** While the cases say that considered dicta by the state's highest court may provide a reliable indication of how the state court may rule, the Michigan Supreme Court expressly discounted statements by lower Michigan courts and its own statements in an analogous case concerning the manufacturer's duty to warn. stating that, "[a]s dictum, that statement does not establish Michigan law. Although there are several decisions by the Court of Appeals on this issue, they too were based on the *Smith* dictum." *In re Certified Questions,* 419 Mich. at 697, 358 N.W.2d 873. Consequently, in determining how the Michigan Supreme Court would decide the question, the related dicta is of no value.

**5.** A federal district court sitting in effect as the highest court of a state,
> "should strive to duplicate, as nearly as possible, the judicial method of the state court. The federal court should seek out and examine those judicial materials which the state court would consider in arriving at a decision."

Note, *The Ascertainment of State Law in a Federal Diversity Case,* 40 Ind.L.J. 541, 553 (1965).

**6.** See *Dailey v. Parker, supra,* at 177 ("We are persuaded that because such rights have not heretofore been recognized, is not a conclusive reason for denying them. They will be denied if it appears that the state court has spoken and denied them. If said rights have not been denied in the state court, we see no reason why the Federal Courts should be more prone to deny or grant them than a state court. If the state courts have not acted, we are free to take the course which sound judgment demands.")

**7.** See *Towards a Jurisprudence of Injury: The Continuing Creation of a System of Substantive Justice in American Tort Law,* Report to the American Bar Association (ABA Report), November 1984 at 2–13, 12–1, 12–2 ("An important benefit of the tort system accrues from the way it provides the incremental wisdom of the common law process.").

tion. While it may be argued that far-reaching policy decisions should be implemented through legislation rather than judicial decision, "it may be questioned whether [codification would improve] on the flexibility and responsiveness of the common law." ABA Report, at 2–15.

"American courts have a great responsibility for participation in the creative adaptation of law to current needs. Though some types of reform are beyond the judicial function, primarily because of the distinctive investigatory facilities of legislatures and their distinctive role in relation to reforms of comprehensive character, it is never a satisfactory answer to an argument for judicial creativity that the need for change is one that could be accomplished by statute. Where a need for reform is clear but no reforming statute has been enacted, courts must choose among the unsatisfactory precedent and other rules open to judicial adoption, even though the range of choice may not be as wide as that open to a legislature.

Increasingly in recent decades, American courts have been discharging this responsibility. Some sense of this performance can be obtained from an examination of recent decisions overruling precedents.... In the area of tort law, precedents overruled in decisions of very recent vintage have included decisions concerned with immunities (governmental, charitable, and intrafamily), mental suffering, prenatal injury, consortium, methods of advocacy on issues of damages for pain and suffering, the measure of damages in death actions, the scope of liability of the several tortfeasors who contribute to an injury, liability for non-negligent trespass, the nature of a railroad company's duty with respect to hazards at grade crossings, liability of an occupier of land to a fireman injured on the premises, privity, and extentions of strict liability. Not only is the nature of these cases significant, but also their variety and the number of different courts represented, even though the list is not exhaustive, are impressive evidence of continuing reform of tort law through candidly creative judicial action."

Keeton, *Creative Continuity in the Law of Torts*, 75 Harv.L.Rev. 463, 484–86 (1962) (footnotes omitted). See generally Peck, *Judicial Creativity and Tort Law: Comments on the Common Law Tradition*, Trial, April 1985, at 18; Keeton, *Venturing to do Justice: Reforming Private Law*, (1969).

A deference to legislative decision-making is contrary, not only to the traditional common law development of tort principles, but also cannot be reconciled with past decisions of the Michigan Supreme Court. For example, in *Placek v. City of Sterling Heights*, 405 Mich. 638, 275 N.W.2d 511 (1979), the Michigan Supreme Court adopted the rule of law of comparative negligence although it had been argued that adoption of the rule was more appropriately for the legislature, and, in fact, legislatures in other states had been the primary instrument for adoption of comparative negligence. The Michigan Supreme Court rejected this argument stating:

"[W]hen dealing with judge-made law, this Court in the past has not disregarded its corrective responsibility in the proper case.

.    .    .    .    .

'[O]ur Court has heretofore believed that rules created by the court could be altered by the court. For example, we abrogated the defense of assumption of risk, *Felgner v. Anderson*, 375 Mich. 23 [133 N.W.2d 136] (1965), repudiated the doctrine of imputed negligence, *Bricker v. Green*, 313 Mich. 218 [21 N.W.2d 105] (1946), eliminated the privity requirement in actions for breach of an implied warranty, *Spence v. Three Rivers Builders & Masonry Supply, Inc.*, 353 Mich. 120 [90 N.W.2d 873] (1958), overruled the common-law disability prohibiting the wife from suing for the loss of her husband's consortium, *Montgomery v. Stephan*, 359 Mich. 33 [101 N.W.2d 227] (1960), overruled the common-law disallowance of recovery for negligently in-

flicted prenatal injury, *Womack v. Buch-horn*, 384 Mich. 718 [187 N.W.2d 218] (1971); and even eliminated charitable immunity from negligence, *Parker v. Port Huron Hospital*, 361 Mich. 1 [105 N.W.2d 1] (1960).' "
*Id.* 405 Mich. at 657, 275 N.W.2d 511 (quoting *Kirby v. Larson*, 400 Mich. 585, 625, 256 N.W.2d 400 (1977)).

Questions dealing with duties owed in tort are no less appropriate for judicial resolution than those significant policy questions which have been resolved by the Michigan Supreme Court in the past. This was recognized by the dissent in *In re Certified Questions* which stated that "[t]he duty of a manufacturer to warn of dangers inherent in the use of its product is a creature of common law. Thus, rulings which relate to this duty are well within the appropriate province of this Court." *Id.* 419 Mich. at 698, 358 N.W.2d 873. See also *Stephens v. G.D. Searle & Co.*, 602 F.Supp. 379, 381 (E.D.Mich.1985) (Gilmore, J.). I am satisfied that, in light of the discussion above, the statement that the question of the scope of an oral contraceptive manufacturer's duty to warn should be resolved by the legislature simply offers no impediment to my proceeding to answer the question.

## IV.

### A.

Having determined that it is properly my role to answer the question, it then becomes my responsibility to determine whether the Michigan Supreme Court would impose a duty on the manufacturer of an oral contraceptive to warn consumers directly of the possible side effects associated with their use when required to decide the issue.

If I were to make this determination on the basis of weight of authority alone, the outcome would be clear; the jurisdictions that have considered the question have been virtually unanimous in holding that the manufacturer must warn only the prescribing physician, not the patient.[8] However, I must determine particularly the rule that the Michigan Supreme Court would follow and it is not proper to simply assume that the Michigan Supreme Court would unthinkingly go along with the rule that has been most often applied by other jurisdictions,[9] without engaging in a reasoned analysis of the rule and without closely scrutinizing the reasons for the rule to determine whether its application is warranted here.

■ As a general rule, the manufacturer of a product has a duty to warn the user of known dangers inherent in the use of that product.[10] Courts have treated prescription drugs as an exception to this rule on the assumption that it is reasonable for the manufacturer to rely on the prescribing physician to forward to the patient who is the ultimate user of the drugs any warnings regarding their possible side effects. Thus, as previously mentioned, the majority of jurisdictions have held that a manufacturer of prescription drugs discharges its duty to warn the user of dangers inherent in the use of its product by warning the prescribing physician.[11] This has come to be known as the "learned intermediary" rule since presumably the expertise of the

**8.** See cases cited in *In re Certified Questions*, 419 Mich. at 704–05 n. 4, 358 N.W.2d 873 and in Ortho's Reply Brief in Support of Motion for Summary Judgment, filed February 26, 1985, Appendix A; see also *infra* note 12.

**9.** I recognize that my assumption may be challenged as contrary to what the Michigan Supreme Court did in its decision in *In re Certified Questions*, since it did not answer the question. I also note that when given the clear opportunity to follow the majority rule, the Michigan Supreme Court declined to do so.

**10.** See generally Annot., *Manufacturer's or seller's duty to give warning regarding product as affecting his liability for product-caused injury*, 76 A.L.R.2d 9, 16 (1961) ("That the duty of ordinary or reasonable care which lies at the foundation of the law of negligence commonly comprehends a duty to warn of danger, the nonperformance of which will, when it is the cause of injury, give rise to liability is, of course, a legal truism.").

**11.** See *supra* note 8.

prescribing physician causes the patient to rely on the physician rather than the manufacturer for any warnings.

In substance the learned intermediary rule is not new;[12] however, it was not until the relatively recent decision in *Sterling Drug, Inc. v. Cornish*, 370 F.2d 82 (8th Cir.1966), that the term "learned intermediary" was used.[13] With the use of these words *Sterling* became the leading case on the subject and the starting point for any subsequent analysis of the scope of a drug manufacturer's duty to warn. In actuality the arguments generally advanced in support of the learned intermediary rule were well-developed by the time of *Sterling* decision:[14]

"(1) [T]he doctor is intended to be an intervening party in the full sense of the word. Medical ethics as well as medical practice dictate independent judgment, unaffected by the manufacturer's control, on the part of the doctor. (2) Were the patient to be given the complete and

---

**12.** The earliest cases concerning the liability of drug manufacturers to injured drug users held the manufacturers liable. Drugs in general were considered an exception to the privity requirement; while the selling druggist was the party directly contracting with the manufacturer, drugs were considered to be "inherently dangerous", therefore negligence in their manufacture or sale was considered actionable by third parties who suffered from that negligence. See *Mazzetti v. Armour & Co.*, 75 Wash. 622, 135 P. 633, 634 (1913); *Thomas v. Winchester*, 6 N.Y. 397 (1852); see also *Halloran v. Parke, Davis & Co.*, 245 A.D. 727, 280 N.Y.S. 58 (1935) (drug manufacturer held liable to consumer for failure to warn).

One of the first intimations that the manufacturer's duty to the ultimate consumer would be limited in the case of prescription drugs is found in *Hruska v. Parke, Davis & Co.*, 6 F.2d 536 (8th Cir.1925). The court, while holding that the manufacturer was liable to the consumer despite lack of privity, stated

"The defendant deals with the public to be treated with its preparations and drugs, not on an equal footing, but with the understanding the public will trust to the superior intelligence and general knowledge of defendant, its agents and employees, in the manufacture and preparation of its products; also, when its compounds, drugs, and preparations are placed on the market, that they are safe, harmless and beneficial in use. In other words, the public relies on the truth of such statements employed in advertising by the defendant, *and does not seek expert advice from others regarding the propriety of the use of the commodities defendant has manufactured and placed on the market.*"

*Id.* at 538 (emphasis added). In *Carmen v. Eli Lilly & Co.*, 109 Ind.App. 76, 32 N.E.2d 729 (Ind.App.1941) (en banc), plaintiff's decedent died as a result of a rabies vaccine manufactured by defendant and administered by his physician. Plaintiff alleged that the defendant was negligent in having failed to warn the deceased and his physician of the dangers involved in use of the vaccine. Though the defendant argued that its duty to warn ran only to the physician who administered the drug, the court determined that the warnings given by defendant had been adequate in any event and so found it unnecessary to reach the question of defendant's duty to plaintiff's decedent.

Apparently the earliest reported case which actually held that the manufacturer's duty to warn is fulfilled by adequate warnings given to the prescribing physician is *Marcus v. Specific Pharmaceuticals, Inc.*, 191 Misc. 285, 77 N.Y. S.2d 508 (1948). The court, in granting the defendant manufacturer's motion to dismiss, stated,

"it is difficult to see on what basis this defendant can be liable to plaintiff. It made no representation to plaintiff, nor did it hold out its product to plaintiff as having any properties whatsoever. To physicians it did make representations. And should any of these be false it might be claimed with propriety that they were made for the benefit of the ultimate consumers. But there is no such claim. The sole claim is not misrepresentation or even concealment, but a negligent failure to give adequate information, and in some instances a failure to use adequate means to call attention to the information given. It may be safely conceded that these allegations would be sufficient if the product were sold to the public generally as a drug for which no physician's prescription was necessary. The situation alleged is materially different."

*Id.* at 509. (*Marcus v. Specific Pharmaceuticals, Inc.*, 82 N.Y.S.2d 194 (1948) concerned a challenge to plaintiff's amended complaint. This time the court denied defendant's motion to dismiss stating that plaintiff stated a cause of action with regards to the adequacy of the warning given.).

**13.** 370 F.2d at 85. ("[I]n this case we are dealing with a prescription drug rather than a normal consumer item. In such a case the purchaser's doctor is a learned intermediary between the purchaser and the manufacturer.").

**14.** See cases cited *supra* note 12; see also *Stottlemire v. Cawood*, 213 F.Supp. 897 (D.D.C.1963); *Magee v. Wyeth Laboratories, Inc.*, 214 Cal. App.2d 340; 29 Cal.Rptr. 322 (1963).

highly technical information on the adverse possibility associated with the use of the drug, he would have no way to evaluate it, and in his limited understanding he might actually object to the use of the drug, thereby jeopardizing his life. (3) It would be virtually impossible for a manufacturer to comply with the duty of direct warning, as there is no sure way to reach the patient."

Rheingold, *Products Liability—The Ethical Drug Manufacturer's Liability,* 18 Rutgers L.Rev. 947, 987 (1964) (footnotes omitted).

### B.

Plaintiff argues that while the learned intermediary rule might make sense where prescription, or "ethical", drugs other than contraceptives, sometimes referred to as "therapeutic" drugs, are involved, the reasons that have been advanced in support of the rule do not support its application in the context of oral contraceptives. Although it is true that most of the cases applying the learned intermediary rule have involved therapeutic drugs, the rule has also been applied in a number of cases involving oral contraceptives.[15] In fact, at the time I certified this question to the Michigan Supreme Court there were no cases which supported plaintiff's argument that there was a duty to directly warn a user of oral contraceptives of dangers involved in their use.[16] Now, quite apart

from the dissenting opinion in *In re Certified Questions,* two very recent cases have held that such a duty exists.

In *MacDonald v. Ortho Pharmaceutical Corp.,* 394 Mass. 131, 475 N.E.2d 65 (Mass. 1985), plaintiff suffered, like Odgers, a stroke which allegedly resulted from her use of defendant's oral contraceptive. The case was submitted to a jury on the theory that defendant was negligent if it had either failed to warn the physician or failed to warn plaintiff directly. The jury returned a verdict for plaintiff, finding that the physician had been adequately warned but that the manufacturer had breached its duty to warn the plaintiff. On appeal the Supreme Judicial Court of Massachusetts upheld the trial court's instruction that the manufacturer had a duty to warn plaintiff directly; the learned intermediary rule was held to be inapplicable where oral contraceptives were involved. The court reasoned that "[o]ral contraceptives ... bear peculiar characteristics which warrant the imposition of a common law duty on the manufacturer." *Id.* 475 N.E.2d at 69.

The Supreme Judicial Court of Massachusetts forwarded three reasons for distinguishing between oral contraceptives and other prescription drugs. First, the court found that patients play a very different role in a physician's decision to prescribe the pill:

---

**15.** *Skill v. Martinez,* 91 F.R.D. 498 (D.N.J.1981), aff'd, 677 F.2d 368 (3d Cir.1982); *Brochu v. Ortho Pharmaceutical Corp.,* 642 F.2d 652 (1st Cir.1981); *Lindsay v. Ortho Pharmaceutical Corp.,* 637 F.2d 87 (2d Cir.1980); *Dunkin v. Syntex Laboratories, Inc.,* 443 F.Supp. 121 (W.D. Tenn.1977); *Chambers v. G.D. Searle & Co.,* 441 F.Supp. 377 (D.Md.1975), aff'd, 567 F.2d 269 (4th Cir.1977); *Goodson v. Searle Laboratories,* 471 F.Supp. 546 (D.Conn.1978); *Carmichael v. Reitz,* 17 Cal.App.3d 958, 95 Cal.Rptr. 381 (1971); *Hamilton v. Hardy,* 37 Colo.App. 375, 549 P.2d 1099 (1976); *Mahr v. G.D. Searle & Co.,* 72 Ill.App.3d 540, 28 Ill.Dec. 624, 390 N.E.2d 1214 (Ill.1979); *Ortho Pharmaceutical Corp. v. Chapman,* 180 Ind.App. 33, 388 N.E.2d 541 (Ind. Ct.App.1979); *McEwen v. Ortho Pharmaceutical Corp.,* 270 Or. 375, 528 P.2d 522 (1974); *Leibowitz v. Ortho Pharmaceutical Corp.,* 224 Pa.Super. 418, 307 A.2d 449 (1973).

**16.** While two cases decided prior to the decision of the Michigan Supreme Court held that there is a duty to directly warn the user, neither of these cases offer plaintiff any support. See *In re Certified Questions,* 419 Mich. at 705 n. 6, 358 N.W.2d 873. *Seley v. G.D. Searle and Co.,* 15 Ohio Op.3d 338 (1980), rejected the learned intermediary rule on the grounds that the manufacturer had voluntarily undertaken to warn prospective users in certain pamphlets, and having so undertaken, it had a duty to inform prospective users fully. *Seley* was reversed on appeal, 67 Ohio St.2d 192, 423 N.E.2d 831 (1981). In *Lukaszewicz v. Ortho Pharmaceutical Corp.,* 510 F.Supp. 961 (E.D.Wis.1981), the court held that the applicable Federal Food and Drug Administration ("FDA") regulation imposed a duty to warn in compliance with its provisions and plaintiff alleged a failure to comply. Plaintiff here makes no such allegations.

"Whereas a patient's involvement in decisionmaking concerning use of a prescription drug necessary to treat a malady is typically minimal or nonexistent, the healthy, young consumer of oral contraceptives is usually actively involved in the decision to use 'the pill,' as opposed to other available birth control products, and the prescribing physician is relegated to a relatively passive role."

*Id.* Not only did the court conclude that the physician is relegated to a supporting role in the initial decision, it also found that

"the physician prescribing 'the pill,' as a matter of course, examines the patient once before prescribing an oral contraceptive and only annually thereafter. J. Willson, E. Carrington, & W. Ledger, Obstetrics and Gynecology 184 (7th ed. 1983). D. Danforth, Obstetrics and Gynecology 267 (4th ed. 1982). T. Green, Gynecology: Essentials of Clinical Practice 593 (3rd ed. 1977). At her annual checkup, the patient receives a renewal prescription for a full year's supply of the pill. Thus, the patient may only seldom have the opportunity to explore her questions and concerns about the medication with the prescribing physician."

*Id.* (footnote omitted). Finally, the court considered the fact that oral contraceptives are "specifically subject to extensive Federal regulation ... designed to ensure that the choice of 'the pill' as a contraceptive method is informed by comprehensible warnings of potential side effects", *Id.,* to weigh in favor of imposing a common law duty to warn on the manufacturer.[17]

In *Stephens v. G.D. Searle & Co., supra,* the court was presented with the same problem with which I am faced, i.e., determining the position likely to be taken by the Michigan Supreme Court on this issue. The court adopted the rule of the dissenting opinion in *In re Certified Questions* for the reasons there stated and held that the learned intermediary doctrine is inappli-

cable in cases involving oral contraceptives. Aside from describing the dissent as "vigorous and intelligent", the court, however, failed to clearly articulate its reasons for concluding that should the Michigan Supreme Court be faced again with the question the majority would adopt the dissent's position. Consequently, while the decision of another federal court predicting state law may be helpful in making an "Erie guess", see *Lesnefsky v. Fischer & Porter Co., Inc.,* 527 F.Supp. 951 (E.D.Pa.1981); *Factors Etc., Inc. v. Pro Arts, Inc.,* 652 F.2d 278 (2d Cir.1981), *cert. denied,* 456 U.S. 927, 102 S.Ct. 1973, 72 L.Ed.2d 442 (1982), the decision in *Stephens* is not really helpful.

As previously mentioned, the *Stephens* opinion basically adopts the reasons advanced by the dissent in *In re Certified Questions* for rejecting the learned intermediary rule. For the most part those reasons are the same as those given in *MacDonald*: use attributed to consumer demand rather than physician's advice, use for extended periods without medical assessment, and FDA regulations requiring direct warnings to patients. In addition, the dissent and the court in *Stephens* found that consumers of oral contraceptives are subjected to much laudatory publicity attributable to the manufacturers and aimed directly at consumers. This, they concluded, distinguishes oral contraceptives from other ethical drugs and is another factor which justifies imposition of a duty to warn. See *Stephens* at 380–81; *In re Certified Questions, supra,* 419 Mich. at 712, 358 N.W.2d 873.[18]

## C.

Defendant argues that I should reject the approach adopted by the dissent *In re*

---

17. Defendant argues, contrary to the conclusion of the Massachusetts court, that the fact that the FDA has promulgated extensive regulations concerning the warnings required to be given the consumer of oral contraceptives is something

which weighs against the imposition of a common law duty. See *infra* Part IV., C.

18. See *infra* part IV., C.

*Certified Questions* and by the court in *Stephens*.[19] Defendant says that

"[t]he dissenting opinion is premised on three [unsubstantiated] assumptions. First, it assumes that consumer demand for oral contraceptives has been generated by 'zealous marketing by manufacturers'. Second, it assumes that oral contraceptives are unique in that they are not intended for the treatment of illness or injury. Third, the dissent makes a judgment that there are 'ordinary prescription drugs,' but oral contraceptives are not included."

Defendant's Reply Brief in Support of Motion for Summary Judgment filed February 26, 1985 at 5. Defendant's second and third arguments may be considered together since both are directed towards the distinction made between oral contraceptives and other types of prescription drugs.

Defendant claims the finding that demand for oral contraceptives is attributable at least in part to zealous marketing by manufacturers is unfounded and unsupported. Defendant particularly objects because the finding is premised "almost exclusively on a 1972 Hastings Law Journal note," Note, *Liability of Birth Control Pill Manufacturers*, 23 Hastings L.J. 1526 (1972).

The dissent in *In re Certified Questions* did rely on the Note in its conclusion that manufacturers have adopted zealous marketing techniques aimed at the consumer in order to promote oral contraceptives. While the dissent does not directly cite the Note in the part of its opinion discussing the manufacturers' marketing techniques, all of the sources it cited appear in the Note. See Note, *supra*, at 1528 n. 18 and 1531 n. 28. However, contrary to defendant's argument, the conclusions drawn by the author of the Note are not unsubstantiated. The sources supporting the conclusion were clearly cited. While the fact that these sources are now dated may detract from their weight, the conclusion drawn by

the dissent concerning marketing techniques is not to be disregarded merely because the conclusion was drawn from the Note. I do not, however, rely on the Note in my decision, and since reliance on the portion of the dissent in *In re Certified Questions* referring to marketing techniques would be in effect indirect reliance on the Note, I have also disregarded that part of the dissent. It should be noted that the Massachusetts court in *MacDonald* did not find it necessary to make any findings with regard to the marketing of oral contraceptives in coming to the same conclusion as the dissent in *In re Certified Questions*.

Defendant next argues that the distinction made by the dissent in *In re Certified Questions*, between therapeutic drugs or "ordinary" prescription drugs and oral contraceptives is both unsound and unworkable. The crux of defendant's argument is that oral contraceptives are often used for "therapeutic" as well as contraceptive purposes. Applying this fact to a duty to directly warn the consumer of oral contraceptives defendant reasons that

"(a) the manufacturer must warn patients who receive the drug for non-therapeutic reasons, (b) the manufacturer has no way of knowing the purpose for which the drug is prescribed, therefore (c) the manufacturer must provide warnings to all users, irrespective of the reasons for the prescription."

Defendant's Reply Brief in Support of Motion for Summary Judgment filed February 26, 1985 at 9. Defendant concludes that since a rule of notice to the consumer inevitably will require a manufacturer to warn those who are not using "the pill" for contraceptive purposes, such a rule does more than merely create an exception to the "learned intermediary" rule when oral contraceptives are involved—it also impinges on the learned intermediary rule in the

---

**19.** Defendant filed its motion papers just before the decision in *MacDonald* was handed down and therefore does not address that decision. However, I am sure that I may presume that defendant did not find the decision of the Supreme Judicial Court of Massachusetts any more compelling than the decision in *Stephens* or the dissenting opinion in *In re Certified Questions*. I have thus viewed defendant's arguments as applying to *MacDonald* as well.

noncontraceptive area by interfering with the physician-patient relationship when an oral contraceptive is prescribed for noncontraceptive purposes.

Defendant's statement that it is not possible to refer to "ordinary" prescription drugs on the one hand and oral contraceptives on the other ignores the fact that there are many differences in the way oral contraceptives and other prescription drugs are treated by both patients and physicians, not to mention the FDA. The law is accustomed to making distinctions based on such factual differences; it should not be that difficult to determine how an oral contraceptive was used in a particular situation and then apply the rule of law accordingly. While the imposition of a duty to warn the user of an oral contraceptive may in fact create a situation where the manufacturer's warnings also reach persons using the oral contraceptive for therapeutic purposes, on balance I am satisfied that the interference with the physician-patient relationship in these situations is of less danger than the absence of direct user warnings in the circumstances of this case.[20]

Finally, defendant has submitted a substantial amount of material concerning the history and substantive content of the FDA's regulation of oral contraceptives. In a nutshell, defendant argues that the FDA's exhaustive requirements regarding package inserts for oral contraceptives, see 21 C.F.R. § 310.501, as a practical matter make it impossible to deviate from these requirements in order to conform to a common law duty to warn. Defendant argues that the FDA maintains strict control over the labeling of oral contraceptives and that a substantial part of the language of a manufacturer's labeling is in fact specifically drafted and mandated by the FDA.

■ Both the *MacDonald* court and the dissent in *In re Certified Questions* found the fact that the FDA has specifically promulgated regulations designed to get information on oral contraceptives to the consumer to be a factor weighing in favor of imposition of a common law duty to warn. The regulations evidence an awareness on the part of the federal regulatory authorities that direct patient warnings are necessary for "safe and effective use of oral contraceptive drug products". 21 C.F.R. § 310.501(a)(1). Significantly, the preamble to the 1978 regulations[21] reads as follows:

"The Commissioner does not agree that the imposition of a requirement for patient labeling will necessarily affect adversely the standard of civil tort liability which is imposed on drug manufacturers or dispensers. Whether or not a corporation or individual is to be held liable in a given situation will depend upon the facts surrounding the manufacture, sale, and use of the drug product, and on the nature of the injury. It will also depend on the applicable state law, which the Commissioner notes, can be adjusted by state courts and Legislatures in light of the facts presented by patient labeling."

43 Fed.Reg. 4214 (Jan. 31, 1978). Consequently, I am of the opinion that the FDA's regulation of oral contraceptives was not

---

**20.** All that I am required to do in this case is to find the rule of law to be applied to the dispute currently before me, see *Matthew* 6:33 (King James).

**21.** "The 1978 revision evolved from an FDA proposal in the Federal Register in December, 1976. The 1976 proposal substantially reviewed both the physician and patient labeling. Both were amended to include reference to continuing medical developments regarding the risks and benefits of oral contraceptives. In addition, the FDA recommended a change in the method by which patients received information. In place of the short package insert and supplemental brochure delivered to patients, the 1976 proposal recommended two new types of patient information: (1) a brief summary of certain essential information included in each package dispensed to patients, and (2) a longer, detailed leaflet in or accompanying each package. Both labels would be given to the patient when the drug was dispensed." Defendant's Memorandum Regarding Federal Regulation of Oral Contraceptives filed April 16, 1985 at 13.

intended in any way to preclude imposition of tort liability for failure to warn.[22]

### V.

■ In sum, I have no doubt that the better rule of law is that the manufacturer of an oral contraceptive has a duty to warn the user of the possible side effects. The reasoning behind the rule of the learned intermediary—the reliance placed by the patient on the physician and interference with that relationship—simply does not hold up when the drug involved is an oral contraceptive. I am satisfied, as was acknowledged in *Stephens* and *MacDonald,* that a patient does not rely on the physician to nearly the same degree when it comes to choosing a method of contraception as in a decision regarding a therapeutic drug. In *Sterling Drugs, Inc. v. Cornish, supra,* the leading case on the learned intermediary rule, the court justified its application of the rule of the learned intermediary as follows:

"[i]f a doctor is properly warned of the possibility of a side effect in some patients and is advised of the symptoms normally accompanying the side effects, there is an excellent chance that injury to the patient can be avoided. *This is particularly true if the injury takes place slowly, as is the case with the injury in question here.* "

370 F.2d at 85 (emphasis added). In contrast, when a woman takes an oral contraceptive as a means of birth control supervision is minimal. As has been noted, the woman generally sees the physician only once a year, and even then, a visit is not necessarily required when all that is needed is a refill—such prescriptions may be easily telephoned in. Therefore, unlike the situation presented in *Sterling Drugs,* there is little opportunity for the physician to notice and avert any problems resulting from the use of the oral contraceptive.

Another policy behind the learned intermediary rule, the avoidance of instilling unnecessary fear in a patient who may not understand a warning and who may, as a result, "object to the use of the drug, thereby jeopardizing his life," Rheingold, *supra,* appears to have little application with regard to an oral contraceptive. A woman obviously has a number of options open as to methods of birth control. The more information the woman is supplied with directly, the easier it is to ensure that informed choice is made among the available options. And rejection of an oral contraceptive for purposes of birth control I am satisfied is not life threatening.

Finally, as to those cases which have justified the learned intermediary rule because of the difficulty of direct user/manufacturer communication, the FDA regula-

---

**22.** This conclusion is supported by two recent cases, one by the Michigan Court of Appeals. In *Wooderson v. Ortho Pharmaceutical Corp.,* 235 Kan. 387, 681 P.2d 1038, *cert. denied,* —— U.S. ——, 105 S.Ct. 365, 83 L.Ed.2d 301 (1984), the Kansas Supreme Court upheld a jury award of compensatory and punitive damages for Ortho's failure to warn of the risk of hemolytic uremic syndrome, a rare kidney disorder, associated with the use of its oral contraceptives. Ortho argued, as it argues here, that its package insert warnings complied with FDA requirements. Ortho maintained that the FDA requirements preempted any state law duty to warn. The Kansas Supreme Court rejected Ortho's argument. *Id.* at 1057. The Wooderson decision was criticized in a publication of the American Bar Association's Tort and Insurance Practice Section, Fern, *Punitive Damages in Wooderson v. Ortho: FDA Standards Are Not the Final Word,* The Brief, Spring 1985, at 24.

Similarly, in *May v. Parke, Davis & Co.,* slip op. No. 73452 (Mich.Ct.App. May 6, 1985) the Michigan Court of Appeals held that a trial judge had not erred in excluding evidence that the FDA would not have permitted the warning that individuals with Type A blood have a greater risk of incurring blood clotting disorders than individuals with Type O blood. Defendant sought to admit at trial evidence showing that 2 drug companies had requested permission from the FDA to amend the labeling of their oral contraceptives to include such a warning. The FDA refused on the grounds that " 'the evidence in support of this was not considered sufficient to warrant its inclusion in the labeling.' " *Id.* at 12. The trial court held this evidence inadmissible on the grounds that it was more prejudicial than probative, M.R.E. 403. The Michigan Court of Appeals upheld this ruling. It is also worth noting that while *May* did not concern a direct duty to warn the user of oral contraceptives, the court stated that under *In re Certified Questions* "the defendant may have had a direct duty to warn the decedent." *May,* slip op. at 16, n. 1.

tions mandating package inserts and the booklet have established the means for direct patient warning.[23] Defendant's arguments that the FDA regulations have also mandated the substantive content of these warnings has not been established. The FDA has set a minimum; more in the way of warnings may be required as a matter of state law. This objection, however, goes to the question of adequacy of the warning, not the existence of the duty to warn.[24]

Not only is the rule establishing a duty to warn the user of oral contraceptives directly the more reasoned rule of law, I am satisfied that it is the rule of law that the Michigan Supreme Court would most likely adopt. At the time the Michigan Supreme Court answered the certified question in *In re Certified Questions,* the *MacDonald* decision was yet to be announced. The resistance to change has been broken. In addition, the fact that a majority of the Michigan Supreme Court did not follow the rule of law that up to now has been fairly universally followed indicates a willingness on its part to at least question the rule when it comes to an oral contraceptive. As discussed in section III, *supra,* the Michigan Supreme Court

has not been reluctant to progress the law of torts and has rejected established rules when it is appropriate. I find, as did my colleague in *Stephens,* that the reasons advanced in dissent in *In re Certified Questions* for rejecting the learned intermediary rule are persuasive, and I am satisfied that the position I take now will command a majority of the Michigan Supreme Court at some future date. No more is needed for me to establish as the rule of law in this case that a manufacturer of oral contraceptives has a duty to warn users of its product for birth control purposes directly of any risks inherent in their use.

## VI.

### A.

Defendant has also moved for summary judgment on the grounds that the record establishes that Dr. Wake, the prescribing physician, would have done nothing different in terms of prescribing Ortho-Novum and warning plaintiff had she received the warnings plaintiff alleges were necessary. If I had concluded that the learned intermediary rule was applicable in this case, success in this argument would entitle defend-

---

**23.** See 21 C.F.R. § 310.501 (1984).

**24.** See *MacDonald,* 475 N.E.2d at 70:

"Ortho contends initially that its warnings complied with FDA labeling requirements, and that those requirements preempt or define the bounds of the common law duty to warn. We disagree. The regulatory history of the FDA requirements belies any objective to cloak them with preemptive effect. In response to concerns raised by drug manufacturers that warnings required and drafted by the FDA might be deemed inadequate by juries, the FDA commissioner specifically noted that the boundaries of civil tort liability for failure to warn are controlled by applicable State law. 43 Fed.Reg. 4214 (1978). Although the common law duty we today recognize is to a large degree coextensive with the regulatory duties imposed by the FDA, we are persuaded that, in instances where a trier of fact could reasonably conclude that a manufacturer's compliance with FDA labeling requirements or guidelines did not adequately apprise oral contraceptive users of inherent risks, the manufacturer should not be shielded from liability by such compliance."

A recent annotation in the ATLA Law Reporter discussing the *MacDonald* decision, 28 ATLA L.Rep. 106 (April, 1985), states that:

"Abounding authority supports [the court's ruling that compliance with FDA requirements in not specifically mentioning risk of 'stroke' does not foreclose a state court jury from finding inadequate warning]. While evidence of a manufacturer's compliance with an applicable governmental, statutory or administratiave safety regulation is admissible it does *not* have conclusive effect. Such safety regulations are minima—floors not ceilings. It is open to the jury to find that the common law required other additional or more stringent precautions. See, e.g., *Howard v. McCrory Corp.,* 601 F.2d 133 (4th Cir.1979) (flammability of child's pajamas); *Buccery v. General Motors Corp.,* [60 Cal.App.3d 533], 132 Cal. Rptr. 605 (App.1976) (lack of headrest on utility vehicle); *LaGorga v. Kroger,* 275 F.Supp. 373 (W.D.Pa.1976) (boy's flammable jacket); *Bristol Myers Co. v. Gonzales,* 561 S.W.2d 801 (Tex.1968) (inadequate warning that drug could cause deafness); *Rumsey v. Freeway Manor Minimax,* 423 S.W.2d 387 (Tex.Civ. App.1968) (failure to warn that there was no known antidote for pecticide)."

ant to summary judgment and dismissal of the case. Having concluded that the learned intermediary rule is not applicable, I may not do all that. Proof of no cause in fact between defendant's failure to warn Dr. Wake and plaintiff's injury entitles defendant to summary judgment on plaintiff's claim that Dr. Wake had been inadequately warned but leaves standing plaintiff's claim that she herself had been inadequately apprised of the risks involved in use of Ortho-Novum.

### B.

In Dr. Wake's first affidavit, dated September, 1982, she stated:

"6. In 1975–1976, pre-screening or follow-up tests for antithrombin III levels and thrombin generation index were not routinely performed on patients for whom oral contraceptives were prescribed. Such tests are not routinely performed today. It was not generally accepted medical practice in 1975–1976, nor is it today, to conduct such blood tests on patients for whom oral contraceptives were prescribed. Had Ortho Pharmaceuticals stated in its package inserts or other prescribing materials in 1975–1976 that such tests were available, I would not have performed them routinely on patients for whom I prescribed oral contraceptives, because such tests were not routinely performed or available to practicing physicians, and were not recommended in widely circulated medical literature. For those same reasons, I would not have performed them on Susan Odgers before or after I prescribed Ortho-Novum 1/50.

7. Based on my knowledge and experience in 1975–1976, women of Blood types A, B and AB were not at a materially higher risk of venous thrombosis while taking oral contraceptives than women of blood type O. *Even if* women of blood types A, B and AB were two to three times more likely to develop venous thrombosis than women of blood type O, Ortho Pharmaceutical adequately warned about the risk of venous throm-

bosis for women of *all* blood types, when it stated that the risk of thrombosis was about 1 in 2,000 women. Based on the foregoing, I still would have prescribed Ortho-Novum 1/50 for Susan Odgers."

In a supplemental affidavit, dated February 2, 1983, Dr. Wake states that

"2. While I was at Oakland University, when patients requested contraceptives, I gave them written information concerning the various methods of birth control. I continue that practice today.

.    .    .    .    .

3. The purpose of that information was to identify the basic advantages and disadvantages for various methods of birth control. With respect to those methods, the information listed broad categories of certain disadvantages associated with each one. The handout was not intended to repeat each and every potential side effect, or all other information for that matter, contained in the package insert and other prescribing literature accompanying the product. Rather, it was designed to set forth what I judged to be those basic disadvantages of which my patients should be aware.

4. Based on my knowledge and experience in 1975–1976, and today, women of blood types A, B and AB are not at a materially higher risk of blood clotting while taking oral contraceptives than women of blood type O. *Even if* Ortho Pharmaceutical had stated that women of blood types A, B and AB were two to three times more likely to develop blood clotting than women of blood type O, I would not have considered it necessary or appropriate to include that information in my birth control information sheet or to otherwise advise patients of that information. This was true in 1975, and it is true today."

The supplemental affidavit clarifies what was not established by the first affidavit, namely that whether Dr. Wake still would have prescribed Ortho-Novum in light of the new information or not, she still would not have passed information regarding an increased susceptibility to adverse side ef-

fects to women in blood types A, B, and AB along to Odgers.

Dr. Wake's deposition testimony for the most part mirrors the statements in her affidavits. She states that she would not have performed prescreening or follow-up tests for anti-thrombin III levels and a thrombin generation index even had defendant stated in its package inserts that such tests were available. See Deposition of Dr. Joan Wake, February 11, 1983 at 52. It is less clear in her deposition that Dr. Wake would not have forwarded warnings regarding an increased risk of venous thrombosis to women of blood types A, B and AB, see Deposition at 53–56. However, reading Dr. Wake's deposition testimony together with her affidavits I am satisfied I may fairly infer that Dr. Wake would not have forwarded the warnings. There is nothing to the contrary in the record.

### C.

 Plaintiff argues, relying on *Taylor v. Wyeth Laboratories*, 139 Mich.App. 389, 362 N.W.2d 293 (1985) that since it was Dr. Wake's established practice to give warnings to her patients, the jury could reasonably infer that, if it had been provided to her, Dr. Wake would have given a revised warning as to an increased risk to women of plaintiff's blood type and that she would have tested plaintiff's blood coagulation factors. See *id.* at 401, 362 N.W.2d 293. In *Taylor* the Michigan Court of Appeals held that the jury was entitled to make a similar inference. *Id.*

*Taylor* is distinguishable. While the Court of Appeals in *Taylor* held that the trial judge erred in concluding that there was no showing of proximate cause because there was "no evidence that Dr. Brockington would have changed his advice to decedent if defendant's warnings were altered to plaintiff's specifications," *Id.* at 400, 362 N.W.2d 293 there was also nothing in *Taylor* to indicate that the trial judge had positive evidence, as exists here, that Dr. Brockington would *not* have changed

his advice. In light of Dr. Wake's affidavits, the jury simply could not infer that Dr. Wake would have forwarded the disputed information on to Odgers; such a finding would be mere speculation in the fact of positive evidence to the contrary.[25]

### VII.

In conclusion, I find that the Michigan Supreme Court will adopt a rule of law requiring a manufacturer of an oral contraceptive to directly warn consumers of the dangers associated with its use. I also find that there was no cause in fact between defendant's failure to inform Dr. Wake of coagulation level testing and increased risk of venous thrombosis to certain blood types and plaintiff's injury.

Accordingly, defendant's motion for summary judgment is GRANTED in part and DENIED in part.

SO ORDERED.

---

**25.** See *Kaminski v. Grand Trunk W.R. Co.,* 347 Mich. 417, 422, 79 N.W.2d 899 (1965).