Janie **REAVES**, Plaintiff,

v.

**ORTHO PHARMACEUTICAL CORP.,** a foreign corporation, Defendant.

No. 89–CV–72704.

United States District Court, E.D. Michigan, S.D.

June 19, 1991.

Ronald M. Walker, Thomas H. Bleakley, Bleakley & McKeen, P.C., Detroit, Mich., for plaintiff.

Wallson G. Knack, Warner, Norcross & Judd, Grand Rapids, Mich., for defendant.

## OPINION AND ORDER

FEIKENS, District Judge.

Plaintiff used Ortho–Novum 1/50, an oral contraceptive manufactured by defendant, for approximately thirteen years. In 1986, she developed arterial thromboembolism resulting in the amputation of her left leg just below the knee. She filed suit alleging negligence, breach of warranty and conscious misrepresentation based on allegedly inadequate warnings and instructions to plaintiff and her physicians regarding the risks and potential side effects of Ortho–Novum 1/50. The case is before me now on defendant's motion *in limine* to exclude evidence and argument regarding a duty to directly warn plaintiff of the risks and potential side effects of Ortho–Novum 1/50. For the reasons stated below, defendant's motion is GRANTED.

## I. BACKGROUND

Plaintiff used Ortho–Novum 1/50 almost continuously from 1973 to 1986. She received prescriptions from at least two different physicians during this period. Her prescriptions were typically refillable for six months to a year without medical evaluation.

In early 1986, plaintiff began having cramps in her legs resulting from the development of arterial thromboembolism, a blood clotting disorder. Plaintiff stopped using Ortho–Novum 1/50 in 1986, after being advised that it probably caused the disorder. Several surgeries were performed on plaintiff's legs with little or no effect. Finally, on September 14, 1986, plaintiff's left leg was amputated just below the knee.

On September 12, 1989, plaintiff filed suit alleging that defendant negligently failed to adequately test Ortho–Novum 1/50, failed to adequately warn and instruct plaintiff and her physicians, and failed to advise physicians of necessary and appropriate diagnostic tests to be administered prior to prescribing Ortho–Novum

1/50. Plaintiff also alleged that defendant's inadequate warnings constituted a breach of warranty and that defendant consciously misrepresented the safety of Ortho–Novum 1/50.

## II. ANALYSIS

■ At issue is whether defendant had a duty to warn plaintiff directly of the potential risks and side effects of Ortho–Novum 1/50. Because jurisdiction is premised on diversity of the parties, this case is governed by Michigan law. The Michigan Supreme Court has not yet decided whether a prescription drug manufacturer has a duty to warn the patient directly of the potential risks of prescription drugs generally, or of oral contraceptives specifically. I must therefore predict what the Michigan Supreme Court would do if properly faced with this question. *Ann Arbor Trust Co. v. North American Co. For Life & Health Insurance,* 527 F.2d 526, 527 (6th Cir.1975), *cert. denied,* 425 U.S. 993, 96 S.Ct. 2206, 48 L.Ed.2d 818 (1976); *Odgers v. Ortho Pharmaceutical Corp.,* 609 F.Supp. 867, 869 (E.D.Mich.1985).

Defendant argues that it had no duty to warn plaintiff under Michigan law because the learned intermediary doctrine properly applies and requires only that defendant warn the medical community of the risks associated with Ortho–Novum 1/50. After carefully reviewing Michigan case law, case law from other jurisdictions and the testimony presented at the evidentiary hearing held on this matter, I agree.

■ It is well settled that a manufacturer has a common-law duty to warn the ultimate user of known dangers inherent in the use of its products. *Comstock v. General Motors Corp.,* 358 Mich. 163, 99 N.W.2d 627 (1959), *In re Certified Questions,* 419 Mich. 686, 358 N.W.2d 873 (1984). Failure to adequately warn of such inherent dangers renders a product defective. *Smith v. E.R. Squibb & Sons,* 405 Mich. 79, 273 N.W.2d 476 (1979).

■ However, courts in other jurisdictions have fashioned an exception to this duty for prescription drug manufacturers.

This exception, known as the learned intermediary doctrine, allows these manufacturers to assume that patients rely on physicians to evaluate the benefits and risks of using a certain prescription drug for a particular purpose. Thus, these manufacturers discharge their duty by properly warning prescribing physicians, who act as "learned intermediaries" for their patients, of the risks and harmful side effects associated with the use of prescription drugs. *In re Certified Questions*, 419 Mich., at 701, 358 N.W.2d 873 (Boyle, J., dissenting).

The learned intermediary doctrine emphasizes the physician's duty to be informed of the characteristics of prescription drugs and to exercise independent professional judgment in determining the appropriateness of a specific drug considering the susceptibilities of the patient. *See Seley v. G.D. Searle Co.*, 67 Ohio St.2d 192, 423 N.E.2d 831 (1981). The learned intermediary doctrine protects the physician-patient relationship, emphasizes the physician's duty to exercise independent professional judgment on the patient's behalf and encourages patient reliance on the physician's skill and professional expertise.

■ The Michigan Supreme Court has not determined whether prescription drug manufacturers have a duty to warn patients directly or whether warnings to the medical community are sufficient under Michigan law. In *In re Certified Questions*, 419 Mich. 686, 358 N.W.2d 873 (1984), a four-member majority of the Michigan Supreme Court declined to resolve this issue. The court concluded that Michigan courts had not yet addressed the learned intermediary doctrine and that a determination whether to apply the doctrine could not be derived from existing case law. The court emphasized that its prior statement that a "manufacturer of a prescription drug has a legal duty to warn the medical profession, not the patient, of any risks inherent in the use of the drug which the manufacturer knows or should know to exist," in *Smith v. E.R. Squibb & Sons, Inc.*, 405 Mich. 79, 88, 273 N.W.2d 476 (1979), was mere *dicta* and did not establish Michigan law. Further, the court noted that all Michigan Court of Appeals' decisions addressing the learned intermediary doctrine rely on this *dicta* and, therefore, also fail to establish Michigan law. Given the absence of relevant Michigan case law, the majority concluded that the record before it was insufficient to allow a proper determination of the status of the learned intermediary doctrine.

The three dissenting justices ("dissent") agreed that no applicable rule of law had been announced by Michigan courts. However, they argued that the court should proceed to announce a rule of law resolving the issue. After analyzing the rationale supporting the learned intermediary doctrine, the dissent would have held that the doctrine does apply to prescription drugs under Michigan law. However, they would not apply the doctrine to oral contraceptives used solely for non-curative purposes, because: (1) oral contraceptive use is prompted by consumer demand and patient choice more often than by physician advice; (2) oral contraceptives have been zealously marketed; (3) women take oral contraceptives for extended periods of time without medical assessment; and (4) the mechanism for direct warnings is already in place as a result of Food and Drug Administration regulations requiring warnings and instructions to patients.

There has been no further development of Michigan case law since *In re Certified Questions*. However, two cases from the United States District Court for the Eastern District of Michigan have held that the learned intermediary doctrine, although applicable to prescription drugs generally, does not apply to oral contraceptives under Michigan law.[1]

---

[1.] In addition, in *Beyette v. Ortho Pharmaceutical Corp.*, 823 F.2d 990 (6th Cir.1987), the United States Court of Appeals for the Sixth Circuit, relying on *dicta* from *Smith v. E.R. Squibb* quoted above, held that under Michigan law a manufacturer only has a duty to warn the medical profession of the risks and potential side effects associated with the use of an intrauterine device. Given the denunciation of the *Smith dicta* in *In re Certified Questions*, and the factual distinctions between intrauterine devices and oral contraceptives, however, *Beyette* is not dispositive of the issue before me.

In *Stephens v. G.D. Searle & Co.*, 602 F.Supp. 379 (E.D.Mich.1985), Judge Gilmore, relying in summary fashion on the dissent in *In re Certified Questions*, held that Michigan law requires manufacturers to warn patients directly of the potential risks and side effects of oral contraceptives. However, Judge Gilmore did not make any factual determination that oral contraceptives differ from other prescription drugs. Nor did he set forth any other rationale for refusing to apply the learned intermediary doctrine to oral contraceptives. As such, I do not find *Stephens* persuasive on the issue before me.

In *Odgers v. Ortho Pharmaceutical Corp., supra,* Judge Cohn, taking his cue from the *In re Certified Questions* dissent, evaluated the alleged differences between oral contraceptives and other types of prescription drugs. He concluded that oral contraceptives differ sufficiently from other prescription drugs to warrant imposing a duty to warn patients directly of potential risks and side effects of their use. However, *Odgers* does not reference any factual evidence substantiating such a finding.

■ Considering the rationale behind the learned intermediary doctrine and the current state of Michigan law, I conclude that the Michigan Supreme Court would recognize the doctrine, were that issue properly before it. However, I still must determine whether the Michigan Supreme Court would apply the doctrine to oral contraceptives. Neither the *In re Certified Questions* dissent nor the holdings in *Stephens* and *Odgers* presents any factual basis for concluding that oral contraceptives differ significantly from other prescription drugs. I am therefore forced to make my own independent evaluation of the factual appropriateness of applying the learned intermediary doctrine to oral contraceptives. In this regard, I held an evidentiary hearing on March 7, 1991.

At that hearing, defendant called Dr. Ronald Burkman, Chairperson of Obstetrics and Gynecology at Detroit Henry Ford Hospital and clinical professor of obstetrics and gynecology at The University of Michigan Medical School. Dr. Burkman testified that prior to prescribing oral contraceptives, it is standard practice to interview and examine the patient to determine if she is likely to be a successful user. Physicians typically evaluate a patient's medical and family history to elicit potential risk factors, perform a physical examination and certain tests to ascertain any preexisting conditions which might preclude successful use, and counsel her as to the side effects, risks and benefits of oral contraceptives. Dr. Burkman characterized the physician's role in prescribing oral contraceptives as "active" and the decision to use oral contraceptives as a shared one between physician and patient. He pointed out that physicians do screen patients after evaluating their individual medical characteristics and propensities. Physicians can always refuse to prescribe oral contraceptives; and in cases where a prescription is issued, the physician must determine the appropriate type and dosage to prescribe for a particular patient.

According to Dr. Burkman, most practitioners prescribe oral contraceptives for a three to six-month range initially. If the patient is a successful user and experiences no side effects, the physician may issue a prescription for up to one year. Many different types of prescription drugs are prescribed for three to six months.[2] For Dr. Burkman, the oral contraceptive situation is no different than any other prescription situation. As with other prescription drugs, patients are unlikely to understand technical medical information regarding the nature and propensities of oral contraceptives. Finally, Dr. Burkman indicated that in his professional opinion, a manufacturer could not produce a single, understandable warning that would apply to all classes of users.

---

**2.** Defendant also offered the testimony of Gerald Bodendistel, a practicing pharmacist and adjunct faculty member of the Wayne State College of Pharmacy, by way of deposition. According to Mr. Bodendistel, many prescription drugs used to treat various ailments are prescribed for several months at a time.

Plaintiff called only one witness, Dr. Robert Laird, an expert in clinical pharmacology. Dr. Laird testified regarding the importance and appropriate content of warnings. He emphasized that, as with all prescription drugs, the manufacturer is in the best position to know the potential risks of its product and is best able to warn patients of such risks. However, Dr. Laird offered no testimony regarding the standard practice for prescribing oral contraceptives. Nor did he discuss how oral contraceptives differ from other prescription drugs. Thus, Dr. Laird's testimony was not helpful in determining whether the learned intermediary doctrine ought to apply to oral contraceptives.

Given the testimony presented at the hearing and my reading of *In re Certified Questions,* I find that oral contraceptives do not differ significantly from other prescription drugs. Additionally, I find that the rationale behind the learned intermediary doctrine applies equally to oral contraceptives. The serious nature of the side effects of oral contraceptives testifies to the importance of the physician's role in the evaluation of the risks and benefits of their use. Plaintiff presented no evidence that warning prescribing physicians is ineffective or that any benefit would be gained by directly warning patients. Therefore, I hold that the learned intermediary doctrine does apply to oral contraceptives under Michigan law. This finding is consistent with a majority of decisions in other jurisdictions, which also guide this result.[3]

For the preceding reasons, defendant's motion *in limine* to exclude evidence and argument regarding a duty to directly warn plaintiff of the potential risks and side effects of using Ortho–Novum 1/50 is hereby GRANTED.

IT IS SO ORDERED.

---

3. *See, e.g., Brochu v. Ortho Pharmaceutical Corp.,* 642 F.2d 652 (1st Cir.1981); *Seley v. G.D. Searle & Co.,* 67 Ohio St.2d 192, 423 N.E.2d 831 (1981); *Chambers v. G.D. Searle & Co.,* 441 F.Supp. 377 (D.Md.1975), *aff'd* 567 F.2d 269 (4th Cir.1977); *McEwen v. Ortho Pharmaceutical Corp.,* 270 Or. 375, 528 P.2d 522 (1974). *But see MacDonald v. Ortho Pharmaceutical Corp.,* 394 Mass. 131, 475 N.E.2d 65, *cert. denied* 474 U.S. 920, 106 S.Ct. 250, 88 L.Ed.2d 258 (1985), in addition to *Odgers* and *Stephens, supra.*