Robert I. LARKIN;  and Barbara
A. Larkin, Petitioners,

v.

PFIZER, INC.;  and G.D. Searle
& Co., Respondents.

No. 2002–SC–0746–CL.

Supreme Court of Kentucky.

June 17, 2004.

Rehearing Denied Feb. 17, 2005.

Harry D. Rankin, Luann Devine, Greenebaum, Doll & McDonald, PLLC, Covington, Counsel for Petitioners.

William Kennedy Simpson, Rheanne D. Falkner, David Warner Mushlin, Thompson, Miller & Simpson, PLC, Louisville, Counsel for Respondent Pfizer, Inc.

Susan Simpson Wettle, Sheryl G. Snyder, Frost, Brown, Todd, LLC, Louisville, Irene C. Keyse Walker, Robert C. Tucker, Tucker, Ellis & West, LLP, Cleveland, OH, Counsel for Respondent G.D. Searle & Co.

E. Andre Busald, Busald, Funk, Zevely, PSC, Florence, Counsel for Amicus Curiae Kentucky Academy of Trial Attorneys (Kata).

David T. Schaefer, Woodward, Hobson & Fulton, Louisville, Counsel for Amicus Curiae Product Liability Advisory Council.

Marie Alagia Cull, Cull, Hayden & Vance, PSC, Frankfort, Counsel for Amicus Curiae Pharmaceutical Research and Manufacturers of America.

Opinion of the Court by Justice
COOPER.

This matter reaches us by a request for certification of a question of law from the United States Court of Appeals for the Sixth Circuit. CR 76.37. The operable facts as set forth in the request for certification are as follows:

"Robert Larkin is a 69–year–old resident of Indiana who has been a paraplegic since his involvement in an automobile accident in 1964. Dr. Jeffrey Reynolds has been Larkin's internist since 1988. Over the years, Dr. Reynolds has prescribed Larkin a variety of nonsteroidal anti-inflammatory drugs to alleviate the significant musculoskeletal pain Larkin suffers as a result of his paraplegia.

"In July 1988, Larkin visited Dr. Reynolds's Louisville office with complaints of a head cold. At the time, Larkin had blisters in his mouth and on his arms and legs. Dr. Reynolds prescribed one medication to treat Larkin's sinus infection and another to treat his blistering.

"Several weeks later, in August 1988, Larkin again visited Dr. Reynolds's office, complaining of sinusitis and shoulder pain. Dr. Reynolds gave Larkin a six-pill sample package of Zithromax, an antibiotic manufactured and distributed by Pfizer, Inc., to treat Larkin's sinusitis. Dr. Reynolds instructed Larkin to take two Zithromax pills the first day and one each day thereafter, until the pills were gone. The Zithromax sample package did not contain any written instructions or warning information, and Larkin does not recall any further discussion about the medication with Dr. Reynolds. In addition to providing him with the Zithromax, Dr. Reynolds also changed Larkin's prescribed anti-inflam-

matory medication to Daypro, a drug manufactured by G.D. Searle & Co. Larkin had the Daypro prescription filled at a drug store but testified that he does not remember receiving any literature containing instructions or warnings.

"In late September 1998, Larkin first noticed an itchy rash breaking out on his left arm and shoulder. As his condition worsened, Larkin developed large fluid-filled blisters over a large portion of his body. When the blisters drained, his skin sloughed off. In early October, Dr. Reynolds diagnosed Larkin's condition as toxic epidermal necrolysis and Stevens–Johnson syndrome. It was Dr. Reynolds's opinion that these conditions resulted from Larkin's taking either Daypro or Zithromax, or both.

"Larkin was admitted to a hospital burn unit for treatment of his wounds and was discharged some ten days later. Since then, Larkin—who previously had been able to move about with crutches—has been confined to a wheelchair, and his general strength has deteriorated.

"Toxic epidermal necrolysis (along with its milder form known as Stevens–Johnson syndrome) is a severe, sometimes life-threatening, skin condition that is often drug induced. More than 100 drugs have been implicated in cases of toxic epidermal necrolysis, including the antibiotic Zithromax and the non-steroidal anti-inflammatory Daypro."

"The physician package insert that accompanies Daypro (and is incorporated in the Physician's Desk Reference) provides that Stevens–Johnson syndrome and toxic epidermal necrolysis are 'adverse reactions' experienced 'at an incidence of less than 1%.' Dr. Reynolds was aware that these conditions were associated with Daypro—as well as 'all' other non-steroidal anti-inflammatory drugs—at the time he prescribed the medication to Larkin." He

did not, however, inform Larkin of this risk. Dr. Reynolds testified, 'I wouldn't call it a common side effect that we would normally discuss.' When asked why it was not his practice to inform patients taking Daypro of the risk of Stevens–Johnson syndrome and toxic epidermal necrolysis, he stated:

> Mostly it's the time element, to go over all possibilities of reactions, and there's other reactions that are as severe as Stevens–Johnson. I mean there's numerous possibilities, as you know, by just reading the [Physician's Desk Reference] and looking at the thickness of it, that, from a clinical standpoint, it's an impossibility to try to completely inform your patients of any medicine that they're being prescribed.

According to Dr. Reynolds, when prescribing non-steroidal anti-inflammatory medications, he would typically discuss with patients the gastrointestinal side effects or 'say if something ... doesn't seem right, in particular, when starting a new medicine ... then you need to let me know.'

"The package insert and Physician's Desk Reference entry for Zithromax provide under the heading 'warnings' that 'serious allergic reactions including ... Stevens–Johnson syndrome and toxic epidermal necrolysis, have been reported rarely in patients on [Zithromax] therapy.' Under the heading 'adverse reactions,' it indicates that Stevens–Johnson syndrome and toxic epidermal necrolysis are reported 'rarely' by patients taking the drug. Dr. Reynolds testified that he was aware of the association between Zithromax (and many other antibiotics) and Stevens–Johnson syndrome and toxic epidermal necrolysis at the time he provided the drug to Larkin but that he did not discuss it with his patient."

\*　　\*　　\*　　\*　　\*　　\*

Larkin and his wife sued Pfizer, Inc., and G.D. Searle & Co. for damages under theories of negligence, breach of warranty, and strict liability. They did not sue Dr. Reynolds. In his order granting summary judgment to Pfizer and Searle, United States District Court Judge Thomas B. Russell concluded that Zithromax and Daypro were both "the types of desirable but unavoidably unsafe products described by the Restatement (Second) of Torts, § 402(A), comment k," and, therefore, "the crucial question ... is whether the manufacturer provided an adequate warning." *Larkin v. Pfizer, Inc.,* No. 3:99CV–649–R, slip op. at 5, 2001 WL 34065029 (W.D.Ky. Feb. 8, 2001) (internal quotes omitted).

The question certified to us by the Sixth Circuit Court of Appeals is:

> Whether the learned intermediary doctrine should apply in Kentucky to a case involving an allegation that a manufacturer of a prescription drug failed to warn the ultimate consumer of risks associated with that drug, even though the manufacturer informed the prescribing physician of those risks?

For the reasons explained in this opinion, our answer to the certified question is: "Yes."

## I. THE RULE.

In *McMichael v. American Red Cross,* Ky., 532 S.W.2d 7, 9–11 (1975), our predecessor court adopted comment k to the Restatement (Second) of Torts § 402A, which states an exception to the rule of strict liability:

> k. *Unavoidably unsafe products.* There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs. An outstanding example is the vaccine for the Pasteur treatment of ra-

bies, which not uncommonly leads to very serious and damaging consequences when it is injected. Since the disease itself invariably leads to a dreadful death, both the marketing and the use of the vaccine are fully justified, notwithstanding the unavoidable high degree of risk which they involve. Such a product, properly prepared, and *accompanied by proper* directions and *warning,* is not defective, nor is it unreasonably dangerous. The same is true of many other drugs, vaccines, and the like, many of which for this very reason cannot legally be sold except to physicians, or under the prescription of a physician. It is also true in particular of many new or experimental drugs as to which, because of lack of time and opportunity for sufficient medical experience, there can be no assurance of safety, or perhaps even of purity of ingredients, but such experience as there is justifies the marketing and use of the drug notwithstanding a medically recognized risk. The seller of such products, again with the qualification that they are properly prepared and marketed, *and proper warning is given, where the situation calls for it,* is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk.

Restatement (Second) of Torts § 402A cmt. k (1965) (emphasis added). Thus, the fact that a particular drug might produce unfortunate side effects makes it "unavoidably unsafe" but not "*unreasonably* dangerous" (emphasis added), and strict liability will not obtain if "proper warning is given, where the situation calls for it." *Id.* The "learned intermediary" rule defines "proper warning" in the context of a prescription drug (or medical device). The

American Law Institute (A.L.I.) has stated the rule as follows:

> A prescription drug or medical device is not reasonably safe due to inadequate instructions or warnings if reasonable instructions or warnings regarding foreseeable risks of harm are not provided to:
>
> > (1) prescribing and other health-care providers who are in a position to reduce the risks of harm in accordance with the instructions or warnings; or (2) the patient when the manufacturer knows or has reason to know that health-care providers will not be in a position to reduce the risks of harm in accordance with the instructions or warnings.

Restatement (Third) of Torts: Prods. Liab. § 6(d) (1998). Section 6(d)(1) states the learned intermediary rule, an exception to the general rule that a manufacturer's duty to warn of any risks or dangers inherent in the product runs to the ultimate consumer. *Id.* at § 2 cmt. i. "The obligation of a manufacturer to warn about risks attendant to the use of drugs and medical devices that may be sold only pursuant to a health-care provider's prescription traditionally has required warnings directed to health-care providers and not to patients.... Subsection (d)(1) retains the 'learned intermediary' rule." *Id.* cmt. b.

The rule originated in *Marcus v. Specific Pharmaceuticals*, 191 Misc. 285, 77 N.Y.S.2d 508 (N.Y.Sup.Ct.1948), in which a physician prescribed two suppository tablets per day for a thirteen-month-old child even though the proper prescription for a child that age was one-half tablet per day. In dismissing the complaint against the manufacturer of the suppository, the court observed:

> [I]t is difficult to see on what basis this defendant can be liable to plaintiff. It made no representation to plaintiff, nor did it hold out its product to plaintiff as having any properties whatsoever. To physicians it did make representations. And should any of these be false it might be claimed with propriety that they were made for the benefit of the ultimate consumers. But there is no such claim.... Nor is there any reason to expect that if a doctor did choose to rely on the information given by the manufacturer he would prescribe without knowing what that information was. In the absence of any such grounds for belief there would be no negligence.

*Id.* at 509–10. The term "learned intermediary" was coined in *Sterling Drug., Inc. v. Cornish,* 370 F.2d 82 (8th Cir.1966):

> [I]n this case we are dealing with a prescription drug rather than a normal consumer item. In such a case the purchaser's doctor is a learned intermediary between the purchaser and the manufacturer. If the doctor is properly warned of the possibility of a side effect in some patients, and is advised of the symptoms normally accompanying the side effect, there is an excellent chance that injury to the patient can be avoided.

*Id.* at 85.

■ Although the rule largely applies to prescription drugs, some courts have extended it to cases involving prescription medical implants and devices. *See, e.g., Willett v. Baxter Int'l, Inc.,* 929 F.2d 1094, 1098 (5th Cir.1991) (artificial heart valve); *Phelps v. Sherwood Med. Indus.,* 836 F.2d 296, 303 (7th Cir.1987) (heart catheter); *Brooks v. Medtronic, Inc.,* 750 F.2d 1227, 1231–32 (4th Cir.1984) (cardiac pacemaker); *Lee v. Baxter Healthcare Corp.,* 721 F.Supp. 89, 95 (D.Md.1989), *aff'd,* 898 F.2d 146 (4th Cir.1990) (silicone breast implants). Thus, the A.L.I. included such devices within the purview of section 6(d). Obviously, the rule applies only to pre-

scription drugs and devices and not to over-the-counter products. "A consumer of over-the-counter drugs is, as it were, self-prescribing and is intended, expected, and indeed encouraged by the drug industry to do so. He must, therefore, also be given such information by the manufacturer as will permit him to self-prescribe with a minimum of risk." *Torsiello v. Whitehall Labs.*, 165 N.J.Super. 311, 398 A.2d 132, 139–40 (App.Div.1979).

## II. THE RATIONALE.

■ Three basic rationales have been articulated to support the rule. The first and best rationale is that the prescribing physician is in a superior position to impart the warning and can provide an independent medical decision as to whether use of the drug is appropriate for treatment of a particular patient.

> The rationale supporting this "learned intermediary" rule is that only health-care professionals are in a position to understand the significance of the risks involved and to assess the relative advantages and disadvantages of a given form of prescription-based therapy. The duty then devolves on the health-care provider to supply to the patient such information as is deemed appropriate under the circumstances so that the patient can make an informed choice as to therapy.

Restatement (Third) of Torts: Prods. Liab., *supra*, at § 6 cmt. b.

> Prescription drugs are likely to be complex medicines, esoteric in formula and varied in effect. As a medical expert, the prescribing physician can take into account the propensities of the drug, as well as the susceptibilities of his patient. His is the task of weighing the benefits of any medication against its potential dangers. The choice he makes is an informed one, an individualized medical judgment bottomed on a knowledge of both patient and palliative.

*Reyes v. Wyeth Labs.*, 498 F.2d 1264, 1276 (5th Cir.1974).

> The entire system of drug distribution in America is set up so as to place the responsibility of distribution and use upon professional people. The laws and regulations prevent prescription type drugs from being purchased by individuals without the advice, guidance and consent of licensed physicians and pharmacists. These professionals are in the best position to evaluate the warnings put out by the drug industry.

*Gravis v. Parke–Davis & Co.*, 502 S.W.2d 863, 870 (Tex.Civ.App.1973). *See also West v. Searle & Co.*, 305 Ark. 33, 806 S.W.2d 608, 613 (1991) ("[A] physician must prescribe the drug, the patient relies upon the physician's judgment in selecting the drug, and the patient relies upon the physician's advice in using the drug. That is to say that there is an independent medical decision by the learned intermediary that the drug is appropriate."); *Vitanza v. Upjohn Co.*, 257 Conn. 365, 778 A.2d 829, 841 (2001) ("The learned intermediary doctrine stands for the proposition that, as a matter of law, the prescribing physician of a prescription drug is the person best able to take or recommend precautions against the harm."); *Martin v. Ortho Pharm. Corp.*, 169 Ill.2d 234, 214 Ill.Dec. 498, 661 N.E.2d 352, 357 (1996) ("[P]rescribing physicians, and not pharmaceutical manufacturers, are in the best position to provide direct warnings to patients concerning the dangers associated with prescription drugs."); Restatement (Third) of Torts: Prods. Liab., *supra*, at § 6 cmt. d ("When prescribing health-care providers are adequately informed of the relevant benefits and risks associated with various prescription drugs and medical devices, they can reach appropriate decisions re-

garding which drug or device is best for specific patients.").

■ The second rationale for the rule is that manufacturers lack effective means to communicate directly with each patient. *Reaves v. Ortho Pharm. Corp.*, 765 F.Supp. 1287, 1290 (E.D.Mich.1991) ("patients are unlikely to understand technical medical information regarding the nature and propensities" of prescription drugs); *West*, 806 S.W.2d at 613 ("[I]t is virtually impossible in many cases for a manufacturer to directly warn each patient."); *Gravis*, 502 S.W.2d at 870 ("We hold that it is unreasonable to demand that the manufacturer of drugs specifically warn each and every patient that receives drugs prescribed by the physician or other authorized persons.").

■ The third rationale for the rule is that imposing a duty to warn upon the manufacturer would unduly interfere with the physician-patient relationship. *West*, 806 S.W.2d at 613. *See also Seley v. G.D. Searle & Co.*, 67 Ohio St.2d 192, 423 N.E.2d 831, 840 (1981) ("The patient is expected to place primary reliance upon the physician's judgment, and to follow his advice and instructions as to use of the drug."). Furthermore, since the typical manufacturer's warning provides a list with scores of potential side effects, no matter how minute the possibility of occurrence, the lay consumer might overreact to such warnings and forego beneficial, or even vital, medical treatment. *See* David G. Owen, M. Stuart Madden & Mary J. Davis, *Madden & Owen on Products Liability* § 22:14 (3d ed. 2003) ("[A] patient faced with an overwhelming number of warnings ... may decide not to take a medication prescribed by his physician ....").

### III. ADEQUACY OF WARNING.

■ Even though the manufacturer's duty to warn runs only to the learned intermediary, that warning must still be adequate. *Pittman v. Upjohn Co.*, 890 S.W.2d 425, 429 (Tenn.1994)("[T]he learned intermediary doctrine does not shield a drug manufacturer from liability for inadequate warnings to the physician."). If the manufacturer fails to adequately warn the learned intermediary, then it may be liable to the injured patient-consumer. *McEwen v. Ortho Pharm. Corp.*, 270 Or. 375, 528 P.2d 522, 529 (1974) ("Although the duty of the ethical drug manufacturer is to warn the doctor, rather than the patient, the manufacturer is directly liable to the patient for a breach of such duty." (citations omitted)). *See also Proctor v. Davis*, 291 Ill.App.3d 265, 225 Ill.Dec. 126, 682 N.E.2d 1203, 1213 (1997) (manufacturer cannot evade duty to warn physician by hoping doctors will learn of dangers themselves).

An adequate warning has been defined as one "sufficient to apprise the general practitioner as well as the 'unusually sophisticated medical man' of the dangerous propensities of the drug." *McEwen*, 528 P.2d at 529 (quoting *Parke–Davis & Co. v. Stromsodt*, 411 F.2d 1390, 1400 (8th Cir. 1969)). " '[I]t is incumbent upon the manufacturer to bring the warning home to the doctor.'" *Id.* (quoting Paul D. Rheingold, *Products Liability—The Ethical Drug Manufacturer's Liability*, 18 Rutgers L.Rev. 947, 993 (1964)). "Several cases have held that a package insert may be sufficient for the warning to be adequate as a matter of law." *Wyeth Labs., Inc. v. Fortenberry*, 530 So.2d 688, 692 (Miss. 1988). *See also Plummer v. Lederle Labs.*, 819 F.2d 349, 357 (2d Cir.1987); *Chambers v. G.D. Searle & Co.*, 441 F.Supp. 377 (D.Md.1975), *aff'd* 567 F.2d 269 (4th Cir. 1977) (per curiam). The warning may also be adequate if posted in the Physician's Desk Reference. *Wolfgruber v. Upjohn*

*Co.,* 72 A.D.2d 59, 423 N.Y.S.2d 95, 97 (1979) ("[W]here the warning given to the prescribing physician by the manufacturer through the Physician's Desk Reference (PDR), package inserts and other literature gives specific detailed information on the risks of the drug, the manufacturer has been held absolved from liability as a matter of law.").

Thus, providing an adequate warning to the prescribing physician relieves the manufacturer of its duty to warn the patient regardless of how or if the physician warns the patient. *E.R. Squibb & Sons v. Farnes,* 697 So.2d 825, 827 (Fla.1997) ("Whether the physician in fact reads the warning, or passes its contents along to the recipient of the drug is irrelevant."). *Cf. Mazur v. Merck & Co.,* 964 F.2d 1348, 1368 n. 30 (3d Cir.1992) (irrelevant whether Center for Disease Control (CDC) actually warned vaccinees; real issue was whether manufacturer reasonably relied on CDC's promise to warn where manufacturer had furnished CDC with all necessary information).

## IV. EXCEPTIONS.

Section 6(d)(2) of the Restatement (Third) of Torts: Prods. Liab., *supra,* states the exception to the learned intermediary rule, *i.e.,* the manufacturer must adequately warn the ultimate consumer (patient) when the manufacturer knows or should know that the advisory role of the

health care provider will be greatly diminished.

[I]n certain limited therapeutic relationships the physician or other health-care provider has a much-diminished role as an evaluator or decisionmaker. In these instances it may be appropriate to impose on the manufacturer the duty to warn the patient directly. See Subsection (d)(2).

*Id.* cmt. b.

Courts have carved out exceptions to the learned intermediary rule "where there is a lack of communication between patients and their physicians or where patients essentially control the selection of the product." *Vitanza,* 778 A.2d at 847. None of these exceptions apply to the facts of this case; however, a brief summary explains why the A.L.I. added subsection (d)(2) to Section 6.

The most often recognized exception is for mass immunizations. *Davis v. Wyeth Labs., Inc.,* 399 F.2d 121, 131 (9th Cir. 1968) (recognizing exception for a mass immunization for polio because the immunization was "dispensed to all comers at mass clinics without an individualized balancing by a physician of the risks involved"). *See also Petty v. United States,* 740 F.2d 1428, 1440 (8th Cir.1984); *Givens v. Lederle,* 556 F.2d 1341, 1345–46 (5th Cir.1977); *Reyes v. Wyeth Labs., Inc.,* 498 F.2d 1264, 1276–77 (5th Cir.1974); *Cunningham v. Charles Pfizer & Co.,* 532 P.2d 1377, 1381 (Okla.1974).[1] However, most

---

1. We need not address here the effect, if any, on these precedents of the enactment of the National Childhood Vaccine Injury Act of 1986, which provides in part:

No vaccine manufacturer shall be liable in a civil action for damages arising from a vaccine-related injury or death associated with the administration of a vaccine after October 1, 1988, solely due to the manufacturer's failure to provide direct warnings to the injured party (or the injured party's

legal representative) of the potential dangers resulting from the administration of the vaccine manufactured by the manufacturer.

42 U.S.C. § 300aa–22(c). *But see Allison v. Merck & Co.,* 110 Nev. 762, 878 P.2d 948, 960–61 (1994) (The National Childhood Vaccine Injury Act does not require dismissal of vaccine suits so long as claimants elect not to accept compensation from the government as authorized by the Act).

courts hold that manufacturers have fulfilled their duty to warn if they either obligated or *reasonably* relied upon the purchaser, *e.g.,* the CDC, and provided the purchaser with all relevant and accurate information. *Mazur,* 964 F.2d at 1366–68; *Reyes,* 498 F.2d at 1276–77; *Davis,* 399 F.2d at 131; *Walker v. Merck & Co.,* 648 F.Supp. 931, 935 (M.D.Ga.1986), *aff'd,* 831 F.2d 1069 (11th Cir.1987).

A second exception, recognized by several jurisdictions, is for oral contraceptives.

The oral contraceptive thus stands apart from other prescription drugs in light of the heightened participation of patients in decisions relating to use of "the pill;" the substantial risks affiliated with the product's use; the feasibility of direct warnings by the manufacturer to the user; the limited participation of the physician (annual prescriptions); and the possibility that oral communications between physicians and consumers may be insufficient or too scanty standing alone fully to apprise consumers of the product's dangers at the time the initial selection of a contraceptive method is made as well as at subsequent points when alternative methods may be considered. We conclude that the manufacturer of oral contraceptives is not justified in relying on warnings to the medical profession to satisfy its common law duty to warn, and that the manufacturer's obligation encompasses a duty to warn the ultimate user.

*MacDonald v. Ortho Pharm. Corp.,* 394 Mass. 131, 475 N.E.2d 65, 70 (1985). *See also Odgers v. Ortho Pharm. Corp.,* 609 F.Supp. 867, 878–79 (E.D.Mich.1985); *Stephens v. G.D. Searle & Co.,* 602 F.Supp. 379, 381 (E.D.Mich.1985); *contra Reaves v. Ortho Pharm. Corp.,* 765 F.Supp. 1287, 1291 (E.D.Mich.1991) (rejecting oral contraceptive exception as stated in *Odgers* and *Stephens* ). Virtually every other jurisdiction that has addressed the issue has rejected an exception for oral contraceptives. *See In re Norplant Contraceptive Liab. Litig.,* 955 F.Supp. 700, 704–05 (E.D.Tex.1997), and cases cited therein.

A third exception, recognized only by New Jersey, is for direct-to-consumer advertised drugs.

[W]hen mass marketing of prescription drugs seeks to influence a patient's choice of a drug, a pharmaceutical manufacturer that makes direct claims to consumers for the efficacy of its product should not be unqualifiedly relieved of a duty to provide the proper warnings of the dangers or side effects of the product.

*Perez v. Wyeth Labs., Inc.,* 161 N.J. 1, 734 A.2d 1245, 1247 (1999).[2] *Cf. Whitley v. Cubberly,* 24 N.C.App. 204, 210 S.E.2d 289, 292 (1974) (in non-strict-liability jurisdiction, sufficient instructions do not absolve drug manufacturer of liability where manufacturer over-promoted drug, inducing medical community not to "adequately heed the warnings given").

**2.** However, prior to the decision in *Perez,* New Jersey had codified the learned intermediary rule in N.J. Stat. Ann. § 2A:58C–4, which included a rebuttable presumption that advertisements that complied with Federal Drug Administration (FDA) regulations provided a sufficient warning. Thus, *Perez* adopted the exception subject to the statutory presumption. *Perez,* 734 A.2d at 1259. One commentator has noted that the ultimate result appears to be a victory for plaintiffs but actually narrows the chance of recovery "by leaving a cause of action equivalent to mere agency review." Patrick Cohoon, *An Answer to the Question Why the Time Has Come to Abrogate the Learned Intermediary Rule in the Case of Direct–To–Consumer Advertising of Prescription Drugs,* 42 S. Tex. L.Rev. 1333, 1341 (2001).

## V. OTHER JURISDICTIONS.

To date, the courts of thirty-four states have specifically adopted the learned intermediary rule by common law decision.[3] In addition, in *Peterson v. Parke Davis & Co.*, 705 P.2d 1001 (Colo.Ct.App.1985), the Colorado Court of Appeals, though not specifically adopting the rule (Colorado is not a strict liability jurisdiction), held that the manufacturer was not required to warn anyone other than the attending physician. *Id.* at 1003–04. And in *Mampe v. Ayerst Laboratories*, 548 A.2d 798 (D.C.1988), the District of Columbia Court of Appeals, while not specifically adopting the rule, recognized that the prescribing physician

**3.** Alabama: *Stone v. Smith, Kline & French Labs.*, 447 So.2d 1301, 1304–05 (Ala.1984);
Alaska: *Shanks v. Upjohn Co.*, 835 P.2d 1189, 1200 (Alaska 1992);
Arizona: *Gaston v. Hunter*, 121 Ariz. 33, 588 P.2d 326, 341 (App.1978);
Arkansas: *West v. Searle & Co.*, 305 Ark. 33, 806 S.W.2d 608, 614–15 (1991);
California: *Brown v. Superior Court*, 44 Cal.3d 1049, 245 Cal.Rptr. 412, 419, 751 P.2d 470 (1988);
Connecticut: *Vitanza v. Upjohn Co.*, 257 Conn. 365, 778 A.2d 829, 836–39 (2001);
Delaware: *Lacy v. G.D. Searle & Co.*, 567 A.2d 398, 400 (Del.1989);
Florida: *Felix v. Hoffmann–LaRoche, Inc.*, 540 So.2d 102, 104 (Fla.1989);
Georgia: *Hawkins v. Richardson–Merrell, Inc.*, 147 Ga.App. 481, 249 S.E.2d 286, 288 (1978);
Hawaii: *Craft v. Peebles*, 78 Hawai'i 287, 893 P.2d 138, 155–56 (1995) (adopting learned intermediary rule for silicone breast implants);
Illinois: *Kirk v. Michael Reese Hosp. & Med. Ctr.*, 117 Ill.2d 507, 111 Ill.Dec. 944, 513 N.E.2d 387, 393 (1987);
Indiana: *Ortho Pharm. Corp. v. Chapman*, 180 Ind.App. 33, 388 N.E.2d 541, 548–49 (1979);
Kansas: *Wooderson v. Ortho Pharm. Corp.*, 235 Kan. 387, 681 P.2d 1038, 1049–51 (1984);
Louisiana: *Cobb v. Syntex Labs., Inc.*, 444 So.2d 203, 205 (La.Ct.App.1983);
Maryland: *Nolan v. Dillon*, 261 Md. 516, 276 A.2d 36, 40 (1971);
Massachusetts: *MacDonald v. Ortho Pharm. Corp.*, 394 Mass. 131, 475 N.E.2d 65, 68–69 (1985);
Michigan: *Smith v. E.R. Squibb & Sons*, 405 Mich. 79, 273 N.W.2d 476, 479 (1979);
Minnesota: *Mulder v. Parke Davis & Co.*, 288 Minn. 332, 181 N.W.2d 882, 885 n. 1 (1970);
Mississippi: *Wyeth Labs., Inc. v. Fortenberry*, 530 So.2d 688, 691 (Miss.1988);
Missouri: *Krug v. Sterling Drug, Inc.*, 416 S.W.2d 143, 146–47 (Mo.1967);
Montana: *Hill v. Squibb & Sons*, 181 Mont. 199, 592 P.2d 1383, 1387–88 (1979);
Nebraska: *Freeman v. Hoffman–LaRoche, Inc.*, 260 Neb. 552, 618 N.W.2d 827, 842 (2000);
New Jersey: *Calabrese v. Trenton State Coll.*, 162 N.J.Super. 145, 392 A.2d 600, 604–05 (App.Div.1978), *aff'd*, 82 N.J. 321, 413 A.2d 315 (1980);
New Mexico: *Perfetti v. McGhan Med.*, 99 N.M. 645, 662 P.2d 646, 649 (App.1983);
New York: *Martin v. Hacker*, 83 N.Y.2d 1, 607 N.Y.S.2d 598, 628 N.E.2d 1308, 1311 (1993);
Ohio: *Seley v. G.D. Searle & Co.*, 67 Ohio St.2d 192, 423 N.E.2d 831, 836–37 (1981);
Oklahoma: *Cunningham v. Charles Pfizer & Co.*, 532 P.2d 1377, 1381 (Okla.1974);
Oregon: *McEwen v. Ortho Pharm. Corp.*, 270 Or. 375, 528 P.2d 522, 529 (1974) (however, in *Griffith v. Blatt*, 51 P.3d 1256, 1261–62 (Or.2002), the Supreme Court of Oregon held that the subsequent enactment of a strict liability statute, Or.Rev.Stat. § 30.900, that specifically included a duty to warn but did not include the learned intermediary rule as an exception to that duty precluded application of the rule in an action brought under the statute);
Pennsylvania: *Coyle v. Richardson–Merrell, Inc.*, 526 Pa. 208, 584 A.2d 1383, 1385 (1991);
Tennessee: *Pittman v. Upjohn Co.*, 890 S.W.2d 425, 429–30 (Tenn.1994);
Texas: *Gravis v. Parke–Davis & Co.*, 502 S.W.2d 863, 870 (Tex.Civ.App.1973);
Utah: *Barson v. E.R. Squibb & Sons*, 682 P.2d 832, 835 (Utah 1984);
Virginia: *Pfizer, Inc. v. Jones*, 221 Va. 681, 272 S.E.2d 43, 44 (1980);
Washington: *Terhune v. A.H. Robins Co.*, 90 Wash.2d 9, 577 P.2d 975, 977 (1978).

is the "user" of a prescription drug to whom the warning must be given. *Id.* at 801. Furthermore, federal courts applying state laws have either interpreted the laws of nine other states and Puerto Rico as having adopted the rule or a facsimile thereof, or predicted that those jurisdictions would ultimately adopt it.[4] No court that has directly addressed the issue as an exception to the common law duty to warn has rejected the learned intermediary rule, *per se.*

## VI. ARGUMENTS AGAINST ADOPTION.

The Larkins argue that Kentucky should reject the learned intermediary rule primarily on the basis of the holding in *Montgomery Elevator Co. v. McCullough,* Ky., 676 S.W.2d 776 (1984), that a manufacturer's duty to warn the ultimate consumer is "non-delegable." *Id.* at 782. However, in so holding, *Montgomery* quoted dictum in *Minert v. Harsco Corp.,* 26 Wash.App. 867, 614 P.2d 686, 691 (1980). *Minert,* however, was decided two years *after* the Supreme Court of Washington adopted the learned intermediary rule in *Terhune v. A.H. Robins Co.,* 577 P.2d at 977, and *Minert,* decided by an intermediate appellate court, did not purport to overrule the higher court's decision. Additionally, neither *Minert* nor *Montgomery*

factually resemble the case *sub judice. Minert* involved a claim of defective scaffolding; *Montgomery* involved a defective department store escalator. Obviously, *Minert* and *Montgomery* involved the type of "duty to warn" then described in the Restatement (Second) of Torts § 388 (1965), *adopted by Lloyd v. Lloyd,* Ky., 479 S.W.2d 623, 625 (1972) (involving a defective lawnmower), *viz:*

> One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier
>
> . . .
>
> (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

*Now see* Restatement (Third) of Torts: Prods. Liab. § 2 cmt. i (1998) (manufacturer's duty to warn). Although *Montgomery* did not adopt the concept of "reasonable care" expressed in section 388(c), it is obvious that escalators, scaffolding, and lawn mowers are chattels of a differ-

---

**4.** *Violette v. Smith & Nephew Dyonics, Inc.,* 62 F.3d 8, 13 (1st Cir.1995) (interpreting Maine law); *Guevara v. Dorsey Labs.,* 845 F.2d 364, 366 (1st Cir.1988) (interpreting Puerto Rico law); *Brooks v. Medtronic, Inc.,* 750 F.2d at 1231 (4th Cir.1984) (interpreting South Carolina law); *Petty v. United States,* 740 F.2d at 1440 (8th Cir.1984) (interpreting Iowa law in a case where the federal government statutorily assumed the duty to warn, and then applying the mass immunization exception); *Brochu v. Ortho Pharm. Corp.,* 642 F.2d 652, 656 (1st Cir.1981) (interpreting New Hampshire law); *Ehlis v. Shire Richwood, Inc.,* 233 F.Supp.2d 1189, 1196 (D.N.D.2002) (interpreting North Dakota law); *Menges v. Depuy*

*Motech, Inc.,* 61 F.Supp.2d 817, 830 (N.D.Ind.1999) (interpreting Wisconsin law); *Pumphrey v. C.R. Bard, Inc.,* 906 F.Supp. 334, 337–38 (N.D.W.Va.1995) (interpreting West Virginia law); *Foyle v. Lederle Labs.,* 674 F.Supp. 530, 536 (E.D.N.C.1987) (interpreting North Carolina law and citing *Holley v. Burroughs Wellcome Co.,* 74 N.C.App. 736, 330 S.E.2d 228, 233 (1985), *aff'd,* 348 S.E.2d 772 (1986), for the proposition that in North Carolina, a non-strict liability jurisdiction, warnings are only required to be given to person responsible for patient's care); *McElhaney v. Eli Lilly & Co.,* 575 F.Supp. 228, 231 (D.S.D.1983) (interpreting South Dakota law).

ent nature from prescription drugs. Moreover, Washington's adoption of both the learned intermediary rule for prescription drugs and the "nondelegable duty" rule for other chattels indicates that the two rules are compatible. Thus, *Montgomery* does not mandate rejection of the learned intermediary rule with respect to the duty to warn of adverse side effects of prescription drugs.

Next, the Larkins claim that the General Assembly's failure to mention the learned intermediary rule in the Product Liability Act, KRS 411.300, *et seq.*, indicates a legislative intent not to adopt the rule in Kentucky. Were we to accept this reasoning, no need would exist for the learned intermediary rule, or any warning at all, because the Product Liability Act, KRS 411.320, entitled "Circumstances under which defendant is liable," makes no mention of a duty to warn. It is purely a common law duty.[5] *See generally Post v. Am. Cleaning Equip. Corp.*, Ky., 437 S.W.2d 516 (1968).

Alternatively, the Larkins claim that adoption of the learned intermediary rule is a matter of public policy that should be left to the legislature. *Reda Pump Co. v. Finck*, Ky., 713 S.W.2d 818, 821 (1986) ("[T]he establishment of public policy is the prerogative of the General Assembly."), *superseded by statute on other grounds as recognized by Ingersoll–Rand Co. v. Rice*, Ky., 775 S.W.2d 924, 930 (1988). Of course, in *Reda Pump*, the General Assembly *had* established a public policy by declaring that the contributory

negligence doctrine would apply in product liability actions,[6] whereas this Court had abrogated contributory negligence in favor of comparative negligence in common law actions. *Hilen v. Hays*, Ky., 673 S.W.2d 713, 720 (1984). Regardless, we do not view the adoption of an almost universally accepted exception to a common law rule as a matter of public policy. Only three jurisdictions have adopted the learned intermediary rule by statute, *see* N.J. Stat. Ann. § 2A:58C–4 (1987); N.C. Gen.Stat. § 99B–5(c) (1996); Ohio Rev.Code Ann. § 2307.76(C) (1988), and all three enacted their statutes after their courts had adopted the rule by common law. *See Calabrese*, 392 A.2d at 604–05 (1978 New Jersey case); *Holley*, 330 S.E.2d at 233 (1985 North Carolina case); *Seley*, 423 N.E.2d at 836–37 (1981 Ohio case). Furthermore, the learned intermediary rule is consistent with our informed consent statute, KRS 304.40–320, which anticipates that doctors will inform their patients of any risks or dangers inherent in proposed treatment:

> [T]he claimant's informed consent shall be deemed to have been given where:
>
> . . .
>
> (2) A reasonable individual, *from the information provided by the health care provider under the circumstances*, would have a general understanding of the procedure and medically or dentally acceptable alternative procedures or treatments and substantial *risks*

---

5. The dissenting opinion's reliance on *Griffith v. Blatt*, 51 P.3d 1256 (Or.2002), is misplaced. First, Oregon's product liability act, unlike our act, specifically authorizes a civil action "against a manufacturer ... for damages ... arising out of: ... (2) Any failure to warn regarding a product ...." *Id.* at 1261–62 (quoting Or.Rev.Stat. § 30.900). Second, the person seeking to invoke the learned interme-

diary rule in that case was a pharmacist who sold the product, not the manufacturer of the product. *Id.* at 1258.

6. KRS 411.320(3). The General Assembly subsequently superseded that provision by enacting KRS 411.182(1) which applies comparative fault to product liability actions. 1988 Ky. Acts, ch. 224, § 1.

*and hazards inherent in the proposed treatment or procedures*
. . . .

(Emphasis added.)

■ Finally, we reject the argument that adopting the learned intermediary rule would immunize manufacturers of prescription drugs from products liability claims. Manufacturers still have a duty to warn; the rule only identifies the party to be warned, *i.e.*, the health care provider who prescribes the drugs. If the manufacturer fails to adequately warn the prescribing health care provider, the manufacturer is directly liable to the patient for damages resulting from that failure. *Proctor v. Davis, supra; McEwen v. Ortho Pharm. Corp., supra; Pittman v. Upjohn Co., supra.*

■ Accordingly, having adopted comment k of the Restatement (Second) of Torts § 402A in *McMichael*, 532 S.W.2d at 9–11 (prescription drugs not unreasonably unsafe if adequate warning is given of possible adverse side effects), we now adopt Restatement (Third) of Torts: Products Liability § 6(d) (duty to warn of possible side effects satisfied if adequate warning given to patient's health care provider, subject to exceptions). The posture of this case does not require us to decide which, if any, of the recognized exceptions to this rule should be adopted in Kentucky.

THE LAW IS SO CERTIFIED.

GRAVES, JOHNSTONE, and KELLER, JJ., concur.

WINTERSHEIMER, J., dissents by separate opinion, with LAMBERT, C.J., and STUMBO, J., joining that dissenting opinion.

Dissenting opinion by Justice WINTERSHEIMER.

I respectfully dissent from the majority opinion because the decision to adopt the so-called learned intermediary doctrine as an exception to the clear and unambiguous provisions of the Product Liability Act, KRS 411.300, is a matter solely within the discretion of the General Assembly, and not the judiciary. The so-called learned intermediary doctrine provides a type of summary immunization for pharmaceutical manufacturers and makes the adequacy of warnings to the ultimate consumer a question of law for the court and not a question of fact for the jury.

In Kentucky, the Product Liability Act applies to all damage claims arising from use of products, regardless of legal theory advanced. KRS 411.300(1). *See Monsanto Co. v. Reed*, Ky., 950 S.W.2d 811 (1997). The majority has attempted to supersede statutory law with the common law. Our sister court in Oregon was faced with substantially similar facts and arrived at the proper conclusion that statutes, not the common law, govern strict products liability claims and defenses to those claims. *See Griffith v. Blatt*, 334 Or. 456, 51 P.3d 1256, 1261 (2002). There, the Oregon Supreme Court declined to incorporate the learned intermediary doctrine into the statutory scheme of strict products liability because the defense was a common law defense but the underlying claim was brought by the statutory action. Likewise, by enacting the Product Liability Act, the Kentucky Legislature has preempted the field of strict products liability claims by defining "any action" in KRS 411.300(1). Nowhere in the Product Liability Act is there an incorporation of the common law defense of the learned intermediary doctrine. Instead, the majority has made such legislation by judicial fiat, but it is an unfortunate addition for the reasons below.

This Court should take notice of the abundantly obvious fact that the development of direct to consumer pharmaceutical

advertising has indelibly changed the realities of physician/patient relationships. Anyone who watches television is regularly bombarded with a variety of pharmaceutical products which suggest that the ultimate consumer ask his physician to prescribe a particular advertised product.

This case provides a scenario where the application of the so-called learned intermediary doctrine involves an allegation that the manufacturer of a prescription drug failed to warn the ultimate consumer of the risks associated with that drug, even though the manufacturer advised the prescribing physician of such risks.

A review of the legislative approach to product liability indicates that by the clear and unambiguous language of the Act, the legislature did not intend that such a doctrine be an exception to product liability. *Cf. Reda Pump Co. v. Finck,* Ky., 713 S.W.2d 818 (1986). *Reda Pump Co., supra,* is an example of the Legislature, not this Court, adjusting the Product Liability Act. Only three years after that decision, effective July 15, 1988, the Legislature enacted a revised KRS 411.182, which statutorily overruled *Reda Pump Co.* and KRS 411.320(3) thereby incorporating comparative negligence into the Product Liability Act where previously there was none. *See Ingersoll–Rand Co. v. Rice,* Ky.App., 775 S.W.2d 924 at 930 (1989).

Strict liability for defective products of any kind was codified in the Restatement (Second) of Torts § 402A in 1964. This Court adopted a form of strict liability in *Dealers Transport Co. v. Battery Distributing Co.,* Ky., 402 S.W.2d 441 (1966). In some states, product liability law has been developed through judicial decisions. Some states have taken a statutory approach. In 1978, the Kentucky General Assembly codified the common law product liability and since that time the court has generally held that any major changes

or additions to that law is within the province of the legislature. *See Reda Pump Co.*

This Court has previously recognized that manufacturers of products have a nondelegable duty to warn consumers of the dangers connected with the use of their products. See *Grayson Fraternal Order of Eagles Aerie No. 3738, Inc. v. Claywell,* Ky., 736 S.W.2d 328 (1987). There is really no logical reason for determining that the generally applicable nondelegable duty does not apply to prescription medicine. It must be remembered that the legislature has the sole responsibility for determining public policy where a statutorily established right is in question. *Commonwealth v. Wilkinson,* Ky., 828 S.W.2d 610 (1992); *Surrogate Parenting Associates v. Commonwealth,* Ky., 704 S.W.2d 209 (1986).

The comparative fault amendments adopted in 1998 did not incorporate the so-called learned intermediary doctrine as an exception to liability. There is no question that pharmaceutical manufacturers believe they have very effective methods to communicate directly with consumers. In the first four months of year 2000, pharmaceutical manufacturers' spending has increased 58% when compared to the first four months of 1999. Caroline L. Nadel, *The Societal Value of Prescription Drug Advertisements in the New Millennium: Targeted Consumers Become the Learned,* 9 J.L. and Pol'y 451, 480 (2001). Consumer marketing has made the pharmaceutical industry the 13th largest advertiser in the United States. *See* Mitchell S. Berger, *A Tale of Six Implants: The Perez v. Wyeth Laboratories Norplant Case and the Applicability of the Learned Intermediary Doctrine to Direct–To–Consumer Drug Promotion,* 55 Food & Drug Law Journal 525 (2000). One study cited by a recent commentary on this subject noted that

"patients may make appointments for the sole purpose of requesting a new 'miracle drug' they have seen on television, having no knowledge of whether the drug is truly appropriate for their particular situation." See Andrea M. Greene, *Pharmaceutical Manufacturers' Liability for Direct Marketing and Over-promotion of Prescription Drugs to Product Users*, 26 Am. J. Trial Advoc. 661 (2003). This same study found that as many as a third of the patients asked for information on the drug while one in four asked for the drug itself. *Id.*, at note 6. Three quarters of those patients that asked their doctor to write the prescription for the drug received one. *Id.* Such direct demand for drug products is due to the manufacturer's direct-to-consumer promotion. Given that the manufacturers are now directly marketing and benefiting by increased sales, they must also assume increased share in the risks and duties pertinent to selling a product.

Pharmaceutical companies are in the best position to ensure that adequate warnings are provided to customers. As noted in *Perez v. Wyeth Labs., Inc.*, 161 N.J. 1, 734 A.2d 1245 (1999):

> Our medical-legal jurisprudence is based on images of health care that no longer exist. At an earlier time, medical advice was received ... from a physician.... [Today,] medical services are in large measure provided by managed care organizations. Medicines are purchased in the pharmacy department of supermarkets and often paid for by third-party providers. Drug manufacturers now directly advertise products to consumers on radio, television, the internet, billboards on public transportation, and in magazines.

*Perez, supra,* 734 A.2d at 1246.

This case can have a profound effect on the health and well being of individuals in this Commonwealth. It is an important matter of public policy that should be properly decided by the legislature. The matter needs public and legislative debate which is supported by evidence of its value or otherwise. Such a process can best be obtained through legislative investigative hearings as a matter of public policy. Kentucky product liability law is statutory and amendments to the law are within the discretion of the General Assembly.

LAMBERT, C.J., and STUMBO, J., join this dissent.